Daniel Thomas FITING *v.* STATE of Arkansas

CA CR 05-628                                          229 S.W.3d 568

Court of Appeals of Arkansas
Opinion delivered February 22, 2006

*James Law Firm,* by: *William O. James Jr.,* for appellant.

*Mike Beebe,* Ark. Att'y Gen., by: *Nicana Corinne Sherman,* for appellee.

S AM BIRD, Judge. Appellant Daniel Thomas Fitting[1] was convicted by a jury of possession of drug paraphernalia with intent to manufacture methamphetamine under Arkansas Code Annotated section 5-64-403 (Supp. 2003). He was sentenced to fourteen years' imprisonment in the Arkansas Department of Correction. On

---

[1] Appellant is variously referred to as "Daniel Fitting" and "Daniel Fiting" throughout his brief on appeal. This opinion refers to appellant as "Daniel Fitting" because that is the name contained in the judgment and commitment order and the notice of appeal.

appeal, appellant contends that the trial court erred in denying his motions for a directed verdict. He argues that the State provided no evidence to show that he was in actual or constructive possession of drug paraphernalia with intent to manufacture; that there was no corroboration of the accomplice's testimony; and that the trial court improperly allowed the State to introduce evidence in violation of Ark. R. Evid. 404(b) in order to corroborate the accomplice's testimony. We find no error; thus, we affirm.

At trial, Rhonda Fitting testified that she and appellant had been married for nineteen years, but they were not living together on May 12, 2004. She said that appellant was staying at Eddie McCann's house and that she went to McCann's residence on May 12 to speak to appellant. According to Ms. Fitting's testimony, she and appellant had an argument and she called the police. She told police that she smelled a "strong odor" while at McCann's residence. She admitted that she had previously pled guilty to possession of methamphetamine.

On cross-examination, Ms. Fitting said that appellant did not move in with McCann but that he just stayed at McCann's house "off and on for a couple of weeks." She explained that the strong odor that she smelled when she arrived at McCann's smelled like "something burning or something burnt" and that it "didn't smell like a chemical smell." She said that she did not know who lived with McCann, other than a female named Jennifer Foster and McCann's daughter.

On re-direct examination, Ms. Fitting testified that she "didn't know for sure" whether the burning odor could be methamphetamine. She said that she never entered McCann's house but that she "stood at the door on the front porch." The State also questioned her about a statement that she had previously signed, which said that she "smelled a really strong odor and suspected that they were in the middle of cooking meth" when she was at McCann's house. She explained that she told the officer that the odor "may be methamphetamine," but she did not know for sure. She also said that she thought the appellant was angry that she showed up at McCann's house because she "knew the people that stayed over there were involved with cooking." On re-cross examination, she admitted that she did not know for sure whether methamphetamine was cooking and said that "it just smelled like something was burnt."

Eddie McCann also testified at trial. He said that he was incarcerated because of events that occurred at his home on May

12, 2004, and that he had pled guilty to conspiracy to manufacture methamphetamine, maintaining a drug premise, and possession of drug paraphernalia. He stated that on May 12, 2004, appellant and a female named Jennifer Foster were "cleaning up a cook" when he came home from work and that the police showed up "soon after that." He said that he was in the back bedroom at the time the police arrived, and that appellant and Foster were in the bathroom "wiping everything down" and "bagging everything up." McCann also said that he was "getting ready to burn it" and that he "knew what they were doing."

McCann testified that the police knocked on the front and back doors, but he did not answer. According to McCann, the police left after they knocked the first time. McCann explained that he went outside to "light the stuff in the burn barrel," but his lighter would not work so he came back into the house. McCann said that the police knocked a second time and he answered the door; he then gave consent to the officers to search the house. He said that appellant had been staying with him "off and on for four to six weeks." He also said that appellant would come over to the house for "two or three days at a time" and would then "leave for a couple of days." According to McCann's testimony, appellant lived at McCann's house "part-time." McCann admitted that he had a previous felony conviction for delivery of methamphetamine in 1988.

On cross-examination, McCann said that he lied to police to "cover [his] butt" and that he was "willing to say whatever it takes to get . . . out of trouble." McCann explained that appellant would "come and go" and that appellant had a key to McCann's house. He also said that the back door to his home was always unlocked. He stated that he thought appellant was "hiding" in the bathroom after police arrived.

On re-direct examination, McCann said that he was "not denying that [he] knew what had been going on at [his] house for the five or six weeks that [appellant] had been staying there." He also said he was "getting free meth," so he "knew what was going on." He admitted that, in the sense that he had an agreement with appellant to use his house, he conspired to manufacture methamphetamine.

On re-cross examination, McCann said that he knew what appellant and Foster were doing outside of his bedroom because he was "moving around a lot" going to get something to eat and

drink. He admitted that he tried to minimize his involvement when he spoke to the police. He said that appellant and Foster were trying to clean up. He also said that he had worked all day when he walked into the house, which "smelled just like a meth lab."

The State then attempted to put on evidence that, sixteen days after the events occurring on May 12, 2004, police discovered drug paraphernalia in appellant's work vehicle. The State also proposed to introduce a statement from appellant admitting that the drug paraphernalia in the work vehicle was his. Appellant objected, arguing that the evidence was more prejudicial than probative under Ark. R. Evid. 404(b), and asked the court not to admit it. The trial court overruled the objection, stating as follows:

> [T]he reason I'm going to overrule your objection . . . and the reason I'm going to allow it would be because it does corroborate Mr. McCann's testimony. Regardless of whether or not Mr. Mc-Cann is lying or making this up or whatever, that's strictly up to the jury to decide. But what it does is, Mr. McCann indicated that they had been doing some cooking in there before. He never did say, and no one asked, if Mr. Fitting, the defendant, had cooked there before, but it does give some indication that — he did indicate that Mr. Fitting had cooked there that day. So, it would corroborate Mr. McCann's testimony that he gave today. Whether that testimony is believable or not doesn't matter.

Ivan Hanson then testified for the State that he was appellant's employer in May 2004. He said that on May 28, 2004, he gave law enforcement officers permission to search a company vehicle, which appellant had used as his personal vehicle and had parked at a local gas station. On cross-examination, Hanson testified that he did not see appellant put anything into the vehicle or lock it.

Lieutenant James Kulesa also testified. He said that on May 28, 2004, Hanson gave him permission to search a company truck that was parked at a gas station. During the search, Kulesa found a briefcase behind the driver's seat with components known to be utilized in the manufacture of methamphetamine. Specifically, the briefcase contained a container of Red Devil Lye, a bottle of peroxide, a green balloon, coffee filters, gloves, a plastic container with a red lid, a glass bottle with "reddish" residue, a plastic bag with a white granular substance, a bottle of drain opener, a

Mountain Dew bottle with clear liquid, a glass jar with a bi-layer liquid, a plastic bottle with a hose attached, and a glass bottle with stained filters. Kulesa said that an informant had called him to tell him that the items were in the truck parked at the gas station. He also said that he "processed the truck" and took samples from the items in it.

Kulesa further testified that, on May 31, 2004, appellant came to the Lonoke County sheriff's office and agreed to speak to Kulesa about the items found in the truck. Kulesa said that appellant told him that everything in the vehicle belonged to appellant and that appellant said he "had pretty much been good for thirty days" and "intended to throw the items in a dumpster, but he was running late for work." According to Kulesa, appellant also said that he "was trying to be good and get away from it and he was just trying to get rid of that stuff."

Kulesa also testified that he came into contact with appellant at Eddie McCann's residence around 6:00 p.m. on May 12, 2004, and that appellant was there with McCann and Jennifer Foster. Kulesa stated that he did not receive an answer after he knocked on the front door, so he knocked on the back door. Kulesa said that he noticed a burn barrel near the back door, which contained a can of camp fuel and a bottle that "looked like it had been burned with some kind of sludgy material in it." Kulesa left the house and parked in an adjacent driveway, and McCann came out of the back door of his residence and walked over to the burn barrel. Kulesa returned to McCann's residence, knocked on the back door, and McCann "walked out and put his hands behind his back like to be handcuffed." According to Kulesa, McCann said that appellant and Foster were "hiding in the bathroom" and gave police permission to search his home.

When Kulesa first entered the house, appellant and Foster were "walking toward the living room from the back area of the house where the bathroom and bedroom [were]." Kulesa said that he took them into custody and then searched the rest of the house. Police found the following items in the burn barrel outside: a plastic bag with used balloons, a corner of a plastic bag with black crystal residue, one empty gallon Coleman fuel can, one plastic bottle containing a white-crystal-type material consistent with table salt, and one burnt plastic bottle with white crystal substance emitting acid fumes. Police also found "numerous" coffee filters with staining residue in the area of the burn barrel.

Police found one empty twenty-four-count blister pack labeled "Pseudoephedrine HCl, sixty milligrams" and two syringes by the back door. They also found a plastic bottle containing "the crystal material emitting acid vapors," stained plastic tubing, an aluminum foil boat, and four empty twenty-four-count blister packs labeled "Pseudoephedrine, sixties" in the trash bag hanging on the back door. There were also "numerous" aluminum cans containing thirty-six-count blister packs labeled "Pseudoephedrine HCl, sixty milligrams," as well as a piece of plastic capsule, a plastic baggie and cotton, a syringe cap, and a razor blade. Kulesa said that most of the empty blister packs were actually stuffed inside empty soda cans.

Under the bathroom sink, police found the following: a gallon bottle (approximately half-full) of "seven percent iodine tincture," one full gallon of Ozark camp fuel, and two full-quart bottles of "Rooto" drain opener. On the bathroom counter, they found one full-quart bottle of seventy-percent alcohol, and there was a "grainy, grayish, granular substance" in the toilet. There was also a "white sludge type substance" with an odor of cleaning solvents in the bathtub. Two-quart glass jars and a plastic bottle containing a gray, granular material were found in the clothes hamper in the bathroom.

Under the stove, police found an electric skillet containing a syringe and two rubber gloves with brown stains. On the dresser in one of the bedrooms, there was a large glass pickle jar containing a "red and yellow residue." A small ceramic bowl containing seven burnt hand-rolled cigarettes was on the nightstand. In the other bedroom, there was a piece of plastic straw and a glass mirror "stained with residue." A plastic baggie and four coffee filters were found under the bed. On the couch in the living room, police found one stained coffee filter with residue. Kulesa said that all of these items were collected and sent to the state crime lab for sampling and testing. Kulesa also testified that, on the day after appellant was arrested, he (Kulesa) noticed that appellant's hands had "some type of light orange tint to them."

On cross-examination, Kulesa said that he could not say "specifically" which room appellant and Foster came out of when he first entered McCann's residence to search. He also explained that, when he first entered the residence, there was a "chemical odor." He said that when someone manufactures methamphetamine, the odor can linger for a period of time. Kulesa could not say who put the items in the burn barrel, and he testified that he did

not see appellant put them there. He also said that he could not tell who put the seized items in McCann's house, that he did not know how long they had been there, and that he did not see appellant touch any of the items.

Jennifer Perry, a forensic chemist, testified for the State and explained the general methamphetamine manufacturing process. She also explained that the items seized from the house were commonly used in the manufacture of methamphetamine. She said that she tested the seized coffee filters and found "methamphetamine, phosphorus, and iodine residue" on them. She explained that this was "sludge that they cooked that was not transformed into usable methamphetamine yet." She also said that one of the two-quart glass jars contained a methamphetamine residue. She further explained that the stains on the rubber gloves found were "consistent with iodine staining," and that "sometimes cooks will use gloves to keep their hands from being stained." According to Perry, the red and yellow residue found in the glass pickle jar tested positive for methamphetamine and phosphorus residue.

On cross-examination, Perry admitted that she did not see appellant handle any of these items and that she did not identify any fingerprints. She also said that she did not know who handled the items or who was in possession of them and she did not know how long they had been there or where they had come from. She testified that she took a sample of the gray, granular substance that was in the bathroom toilet, but she did not test it in the lab. She stated that she did not know exactly what the substance was, but said that it was consistent with an HCl generator (*i.e.*, a substance used in the methamphetamine manufacturing process). Perry admitted that this was speculation on her part.

At the close of the State's evidence, appellant moved for a directed verdict on the basis that McCann's testimony was uncorroborated accomplice testimony. The court denied this motion. Appellant also argued that he was entitled to a directed verdict because the State failed to show that he was in constructive possession of the contraband. The trial court also denied this motion. Appellant renewed his motions at the close of all of the evidence, and the court again denied them.

On appeal, appellant contends that the trial court erred in denying his motions for a directed verdict, arguing that the State provided no evidence to show that he was in actual or constructive possession of drug paraphernalia with intent to manufacture; that

there was no corroboration of the accomplice's testimony; and that the trial court improperly allowed the State to introduce evidence in violation of Ark. R. Evid. 404(b) in order to corroborate the accomplice's testimony.

## I. *Sufficiency of the Evidence*

Preservation of an appellant's right to freedom from double jeopardy requires a review of the sufficiency of the evidence prior to a review of trial errors. *Wells v. State*, 93 Ark. App. 106, 217 S.W.3d 145 (2005). It is well settled that we treat a motion for a directed verdict as a challenge to the sufficiency of the evidence. *Price v. State*, 365 Ark. 25, 223 S.W.3d 817 (2006). The test for determining the sufficiency of the evidence is whether the verdict is supported by substantial evidence, direct or circumstantial. *Id.* Evidence is substantial if it is of sufficient force and character to compel reasonable minds to reach a conclusion and pass beyond suspicion and conjecture. *Id.* On appeal, we view the evidence in the light most favorable to the State, considering only that evidence that supports the verdict. *Id.*

### a. *Actual or Constructive Possession*

Appellant first argues that the State failed to provide substantial evidence to show that he was in actual or constructive possession of drug paraphernalia with intent to manufacture, as required by Ark. Code Ann. § 5-64-403 and our case law. In *Walley v. State*, 353 Ark. 586, 112 S.W.3d 349 (2003), our supreme court explained how an appellate review is conducted in connection with a sufficiency-of-the-evidence challenge to possession when two or more persons occupy the residence where the contraband was found:

> Under our law, it is clear that the State need not prove that the accused physically possessed the contraband in order to sustain a conviction for possession of a controlled substance if the location of the contraband was such that it could be said to be under the dominion and control of the accused, that is, constructively possessed. We have further explained:
>
>> Constructive possession can be implied when the controlled substance is in the joint control of the accused and another. Joint occupancy, though, is not sufficient in itself to establish possession or joint possession. There must be some

additional factor linking the accused to the contraband. The State must show additional facts and circumstances indicating the accused's knowledge and control of the contraband.

When seeking to prove constructive possession, the State must establish (1) that the accused exercised care, control, and management over the contraband, and (2) that the accused knew the matter possessed was contraband.

*Darrough v. State* is consistent with a long line of cases holding that "it cannot be inferred that one in non-exclusive possession of premises knew of the presence of drugs and had joint control of them unless there were other factors from which the jury can reasonably infer the accused had joint possession and control."

*Id.* at 595-96, 112 S.W.3d at 353-54 (citations omitted).

In the case at bar, appellant claims that there was no evidence presented at trial to connect him with the commission of an offense and that the State failed to show that he exercised "care, control, and management" over the contraband in question. To support his arguments, appellant points to the fact that he did not live at McCann's residence (where the items were found), that Lt. Kulesa could not specifically identify the room in which appellant was found prior to his arrest, and that Kulesa did not see the appellant put anything into the burn barrel or touch any of the items.

Here, the evidence viewed in the light most favorable to the State reveals that Eddie McCann testified that when he came home from work, appellant and Jennifer Foster were inside his residence "cleaning up a cook." Specifically, McCann said that they were in the bathroom "wiping everything down" and "bagging everything up." He also said that when he walked into the house after work, it "smelled just like a meth lab." Because McCann was an accomplice in this case, the question of whether his testimony was sufficient to show that appellant possessed, either actually or constructively, the drug paraphernalia with the intent to manufacture methamphetamine depends upon whether McCann's testimony was properly corroborated.

### b. *Uncorroborated Accomplice Testimony*

Appellant next argues that the evidence was not sufficient to support his conviction because the State offered uncorroborated testimony from an accomplice, Eddie McCann. Appellant points

to McCann's testimony that he thought appellant was cooking methamphetamine, but "didn't know." Appellant also points to McCann's statement that he lied to police to "cover [his] butt." Furthermore, appellant claims that the State offered no evidence to corroborate McCann's testimony other than evidence that violated Ark. R. Evid. 404(b).

Arkansas Code Annotated section 16-89-111(e) (Repl. 2005) provides as follows:

> (e)(1)(A)  A conviction or an adjudication of delinquency cannot be had in any case of felony upon the testimony of an accomplice, including in the juvenile division of circuit court, unless corroborated by other evidence tending to connect the defendant or the juvenile with the commission of the offense.
>
> (B)  The corroboration is not sufficient if it merely shows that the offense was committed and the circumstances thereof.

In *Tate v. State*, 357 Ark. 369, 167 S.W.3d 655 (2004), our supreme court discussed the requirement of corroborating evidence for accomplice testimony:

> The corroboration must be sufficient, standing alone, to establish the commission of the offense and to connect the defendant with it. The test for corroborating evidence is whether, if the testimony of the accomplice were totally eliminated from the case, the other evidence independently establishes the crime and tends to connect the accused with its commission.
>
> Corroboration must be evidence of a substantive nature, since it must be directed toward proving the connection of the accused with the crime, and not directed toward corroborating the accomplice's testimony. Circumstantial evidence may be used to support accomplice testimony, but it, too, must be substantial. Corroborating evidence need not, however, be so substantial in and of itself to sustain a conviction. Rather, it need only, independently of the testimony of the accomplice, tend in some degree to connect the defendant with the commission of the crime. However, evidence that only raises a suspicion of guilt is insufficient. The presence of an accused in the proximity of a crime, opportunity, and association with a person involved in the crime are relevant facts in determining the connection of an accomplice with the crime.

*Id.* at 374–75, 167 S.W.3d at 658 (citations omitted). The court in *Tate* recognized that the appellant's presence in the proximity of

manufacturing-related items was circumstantial evidence of his involvement and said that, "Where circumstantial evidence is used to support accomplice testimony, all facts in evidence can be considered to constitute a chain sufficient to present a question for resolution by the jury as to the adequacy of the corroboration, and this court will not look to see whether every other reasonable hypothesis but that of guilt has been excluded." *Id.* at 377, 167 S.W.3d at 660. Thus, the court concluded that appellant's presence in a room filled with drug manufacturing paraphernalia and smelling strongly of methamphetamine was sufficient to "tend to contact him to the offenses with which he was charged." *Id.*

■ In light of *Tate, supra,* we hold that the evidence here tends to connect appellant with the offense with which he was charged — possession of drug paraphernalia with intent to manufacture methamphetamine. In addition to McCann's testimony, Lt. Kulesa testified that, when he entered McCann's residence, appellant and Jennifer Foster were "walking toward the living room from the back area of the house where the bathroom and bedroom [were]." Thus, appellant was in close proximity to the manufacturing items that were seized from the residence. Moreover, appellant's wife said that she thought appellant was angry that she showed up at McCann's house because she "knew the people that stayed over there were involved with cooking." She also said that she smelled a "strong odor" while she was at McCann's house and she told police that it might be methamphetamine, although she was not sure. In addition, Lt. Kulesa testified that appellant's hands had "some type of light orange tint to them" on the day after appellant was arrested. All of this evidence was sufficient to corroborate McCann's testimony; accordingly, we hold that the evidence was sufficient to support appellant's conviction in this case.

## II. *Rule 404(b) Evidence*

Appellant's final argument is that the trial court improperly allowed the State to introduce evidence in violation of Ark. R. Evid. 404(b). Our supreme court has held that trial courts are afforded wide discretion in evidentiary rulings. *Cluck v. State,* 365 Ark. 166, 226 S.W.3d 780 (2006). Specifically, in issues relating to the admission of evidence under Ark. R. Evid. 401, 403, and 404(b), a trial court's ruling is entitled to great weight and will not be reversed absent an abuse of discretion. *Id.*

In this case, Lt. Kulesa testified that appellant's employer gave consent to search appellant's work truck and that, during the search, Kulesa found a briefcase in the truck containing components used to manufacture methamphetamine. Kulesa also said that appellant came to the sheriff's office and told Kulesa that "everything in the vehicle belonged to him." Appellant claims that this evidence was offered by the State in violation of Rule 404(b), which states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The State claims that the evidence was properly admitted under Rule 404(b) to show that appellant "had the requisite knowledge and wherewithal to manufacture methamphetamine." However, appellant argues that the evidence was offered "for nothing more than the unfair prejudicial effect it would have had on [him]." Furthermore, appellant claims that the evidence was "all the State could muster in its attempt to corroborate Mr. McCann's uncredible testimony."

In *Cluck, supra,* our supreme court stated as follows regarding the analysis of a Rule 404(b) issue:

> If the evidence of another crime, wrong, or act is relevant to show that the offense of which the appellant is accused actually occurred and is not introduced merely to prove bad character, it will not be excluded. . . . We have held that in order to find prior crimes admissible under Rule 404(b), this court must find that the evidence is "independently relevant, thus having a tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence."

*Cluck,* 365 Ark. at 786, 226 S.W.3d at 174–75 (citations omitted). We note that the case at bar involves appellant's *subsequent* acts rather than *prior* crimes as discussed in *Cluck, supra;* however, this court has recognized that Rule 404(b) also applies to evidence of subsequent bad acts by an appellant. *See Turner v. State,* 59 Ark. App. 249, 956 S.W.2d 870 (1997) (noting that the trial court did not abuse its discretion by allowing into evidence under Rule 404(b) subsequent

acts committed by an appellant, because they followed in close proximity and showed motive, intent, plan, or knowledge by appellant).

■ Here, the trial court allowed the State to introduce testimony concerning the items that were found in appellant's work vehicle sixteen days after the appellant was arrested at McCann's residence, together with appellant's statement to Kulesa that the items in the vehicle were his, for the purpose of corroborating McCann's testimony. We hold that the trial court did not abuse its discretion by allowing the testimony into evidence under Rule 404(b) for this purpose. Our supreme court has recognized that evidence offered by the State to corroborate other evidence is relevant. *Misskelley v. State*, 323 Ark. 449, 915 S.W.2d 702 (1996). Furthermore, our supreme court has stated that the list of exceptions to inadmissibility under Rule 404(b) is not an exclusive list, but instead is representative of the types of circumstances under which evidence of other crimes or wrongs or acts would be relevant and admissible. *Barnes v. State*, 346 Ark. 91, 55 S.W.3d 271 (2001). In *Price v. State*, 268 Ark. 535, 538, 597 S.W.2d 598, 599 (1980), the court recognized that Rule 404(b) "clearly permits evidence [of other crimes or wrongs or acts] if it has relevancy independent of a mere showing that the defendant is a bad character." The court in *Price* affirmed the trial court's decision to admit evidence under the rule, noting that evidence of petitioner's incriminating references on tape to other criminal activity was relevant to show petitioner's "guilty knowledge" of the offense with which the petitioner was charged, and was also "particularly valuable in corroborating the testimony of petitioner's alleged accomplice." *Id.* at 539, 597 S.W.2d at 600.

In light of *Price, supra*, we hold that the evidence in question here falls within the Rule 404(b) exception because it was independently relevant to corroborate McCann's testimony. Thus, our next inquiry is whether the evidence is so prejudicial that it should be excluded under Ark. R. Evid. 403. *See Price, supra*.

■ Rule 403 of the Arkansas Rules of Evidence generally states that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. In the case at bar, appellant argued to the circuit court that Kulesa's testimony was "more prejudicial than probative"; however, appellant failed to obtain a ruling on this particular issue and is

therefore precluded from raising it on appeal. *See Cluck, supra* (recognizing that, where appellant failed to obtain a ruling on his Rule 403 argument, it was not preserved for appellate review).

Affirmed.

HART and NEAL, JJ., agree.