2012 Ark. App. 596

**Timothy Allen WELLS, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CA CR 11–829.**

Court of Appeals of Arkansas.

Oct. 24, 2012.

Gregory Grain, for appellant.

Dustin McDaniel, Att'y Gen., by: Rebecca B. Kane, Ass't Att'y Gen., for appellee.

DOUG MARTIN, Judge.

This is the third time this case has come before the Arkansas Court of Appeals.[1] A Hot Spring County jury found appellant Timothy Wells guilty of attempting to commit first-degree murder and two counts of committing terroristic acts. Wells was sentenced as a habitual offender to forty-five years' imprisonment for attempted first-degree murder and twenty-five years' imprisonment on each count of committing a terroristic act. Wells also received a twelve-year enhancement on each conviction for the commission of a felony using a firearm. The trial court ordered that the sentences run consecutively, for a total of 131 years' imprisonment. Wells makes several arguments on appeal: (1) the trial court erred in denying his motions for directed verdict; (2) the trial court erred in denying a motion to suppress his statement; (3) the trial court erred in admitting evidence of a subsequent murder pursuant to Ark. R. Evid. 404(b); (4) the trial court erred in admitting hearsay. We affirm Wells's convictions.

Robin Halbert, the 911 Director for Hot Spring County, testified that he received a call regarding a shooting on Spruce Street in Malvern on February 12, 2010. A recording of the call was played for the jury, and the victim can be heard screaming that an unidentified black male shot at him when he opened the door of his residence.

Gustavo Cervantes Rodriguez testified that, on February 12, 2010, at approximately 3:00 a.m., there was a knock on the door of his trailer, where he, his wife, and their three children were sleeping. Not realizing the time and thinking he had overslept, Rodriguez opened the door about five or six inches. Rodriguez heard Wells say, "Hey, man." Rodriguez then "saw fire coming out of the barrel" of a gun Wells had pointed at him. Rodriguez immediately slammed the door, and Wells fired two more shots into the trailer. Rodriguez testified that he did not get a good description of the person that shot at him because "[i]t all happened way too fast." Rodriguez testified that he did not know of any reason why someone would attempt to

1. *Wells v. State*, 2012 Ark. App. 348, 2012 WL 1719184 (remanding for rebriefing to include omitted directed-verdict motions); *Wells v. State*, 2012 Ark. App. 151, 2012 WL 474190 (remanding for rebriefing to cure deficiencies and include interpreter's transcript of 911 call).

kill him and insisted that he had done nothing to offend anyone.

At that point, the trial court noted that the prosecutor and defense counsel stipulated that three bullets and one shell casing were properly submitted to the crime lab in relation to the shooting of Rodriguez on February 12, 2010. The parties also stipulated that one bullet and one shell casing connected to a homicide that occurred in Hot Springs on February 13, 2010, were properly collected and transported to the crime lab for forensic evaluation.[2] The trial court then instructed the jury that evidence of other alleged crimes, wrongs, or acts was being offered as evidence of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident but that whether any of the alleged crimes, wrongs, or acts were committed was for the jury to determine.

Rebecca Mullin, a firearm and tool-mark analyst at the Arkansas State Crime Lab, testified that the shell casings from the shooting in Malvern and the homicide in Hot Springs had been loaded into and extracted from the same firearm. Mullin further testified that the bullets from both crime scenes had been fired through the barrel of the same firearm. Mullin also testified that she examined a gun found in connection with the Hot Springs murder but that the results were inconclusive as to whether the bullets and shell casing from the incident in Malvern had been fired from that particular gun. Mullin explained that inconclusive results meant that she could not confirm the weapon was used in Rodriguez's case but could not eliminate that possibility.

Corporal Dan Ussery with the Malvern Police Department testified that he responded to the scene of the shooting on Spruce Street. He processed the scene and took photographs. He noted bullet holes in the front door of the Rodriguez residence. Ussery testified that the bullet holes and trajectory marks were consistent with a door having been opened and slammed. Ussery testified that an intact bullet was found in a back bedroom about three inches from the head of Rodriguez's one-year-old child. Ussery testified to damage from bullets on the corner of a couch and on a piece of wood paneling inside the trailer.

Sergeant Curtis Kyle with the Malvern Police Department testified that a shoe print was left in the snow at the corner of Rodriguez's trailer. According to Kyle, the print was distinctive as to tread pattern and had four circles on the heel impression.

David Hughes, an inmate at the Grimes Unit prison in Newport, testified with respect to Wells: "I been knowing him all my life." Hughes testified that his birthday was February 10, and that, on the day following his birthday in 2010, Wells bought him a shirt and a pair of Nike "Shox" athletic shoes at Hibbett Sports in Malvern. Wells had bought some clothing for himself as well, including a pair of Nike shoes that were "a little different" from Hughes's. Hughes and Wells went to a club that Friday night, and Wells left his new shoes in Hughes's room. Hughes testified that the shoes he later wore to a police interview belonged to Wells, and Hughes explained that he and Wells often wore each other's clothes and shoes.

Corporal Sonny Hall with the Malvern Police Department testified that Hughes was not a suspect in the attempted murder

---

2. The record indicates that the homicide in Hot Springs occurred at 6:30 p.m. on February 12, 2010, and not February 13, 2010.

in Malvern but that the police questioned him with regard to a homicide in Hot Springs. Hall testified that Hughes came to a police interview wearing a pair of Nike shoes. Hall asked Hughes about the shoes and was told that they belonged to Wells. Hall testified that Hughes told him that, since Wells was incarcerated, he decided to wear Wells's shoes because Wells did not need them any longer.

Corporal Brian Johnson with the Malvern Police Department testified that the shoes worn by Hughes appeared to match the shoe print found in the snow near Rodriguez's trailer. Johnson conceded that his experience in comparing shoe prints was from his training with CID (Criminal Investigation Division).

Shannon Shepherd, senior special agent with the Arkansas State Police, testified that he interviewed Wells on February 17, 2010. Shepherd stated that, prior to questioning, he advised Wells of his *Miranda* rights, that Wells wrote his initials beside each right, and that Wells signed the bottom of the rights form. Shepherd testified that he and Sergeant Davis then conducted an interview with Wells. Shepherd testified that, after Davis typed Wells's statement, Wells read the statement, initialed each paragraph, and signed at the bottom. Shepherd then read the document containing Wells's confession:

> On 2–17–10 at approximately 2030 hours I, Sgt. Davis, and Sr. Special Agent Shannon Shepherd (ASP) interviewed Timothy Allen Wells (DOB 10–13–86). I advised Mr. Wells of his Miranda Rights using the Hot Springs Police Department's Standard Rights Form. Mr. Wells advised that he understood both verbally and in writing. The following was his statement:

> Man, I lost my mind the other day in Hot Springs. I blanked out. I'm bipolar and sometimes I flip out and go in a rage. I remember going in that building and a man and lady started screaming at me. My bi-polar acted up and I just shot. Any body could have been hurt that day in Hot Springs. I was ready to go in [sic] a rampage. Jason said that he couldn't believe the way I was acting. I remember going to the Liquor store to cash the check. I was OK there. I remember going to Hot Springs and parking the car. I remember getting out and running into the little building. Jason was yelling at me and I told him to shut the fuck up and I just kept going. In the store, these Arabian, or Indian people were yelling at me and I just shot. They were inside the building. That day anyone could have got hurt. I was ready to kill somebody or kill myself. [Redacted] I didn't know the lady in Hot Springs had died. I threw the gun out the passenger's side window between Malvern and Hot Springs. It was between the Reynolds plant and before the Rainbow Mart. As far as the Mexican dude, I did that deal. I lost my mind. I didn't even know that dude. I woke up the next day and I was like, what did I do. A judge just won't understand. It was cold that day and I was walking and I got cold. I walked up to the door, knocked on it, the Mexican dude opened the door, and I shot. I shot for no reason, because I was on that rampage. I don't remember how many times I shot. I'm glad they stopped me, I need some help.

Sergeant Mark Davis with the Hot Springs Police Department testified that he was investigating the murder of Ms. Patel in Hot Springs and that he went to Malvern to interview Wells because Spe-

cial Agent Shepherd and the Malvern Police Department had developed Wells as a suspect in the Hot Springs homicide. Davis testified that, because Shepherd had established a rapport with Wells, Shepherd questioned Wells while Davis took handwritten notes. Davis testified that, following the interview, Wells reviewed the notes, and Davis immediately typed the notes on a computer at the jail. Wells read the typed document, initialed each paragraph, and signed at the bottom.

The State rested its case, and Wells moved for a directed verdict on all three counts. The trial court denied the motions, and the jury returned with guilty verdicts. In the sentencing phase, Patricia Taylor, Wells's mother, testified that Wells was only twenty-four years old and that he was "a good kid" but had been hanging out with older guys. Taylor testified that Wells had a history of mental illness, was diagnosed with bipolar disorder, suffered depression, and was at times suicidal.[3] Taylor stated that, beginning in ninth grade, Wells "self medicate[d]" with alcohol, Xanax, and cocaine.

### Denial of Directed–Verdict Motions

Wells argues that the trial court erred in denying his directed-verdict motions. A motion for a directed verdict is a challenge to the sufficiency of the evidence. *Arnett v. State*, 353 Ark. 165, 122 S.W.3d 484 (2003). The test for such motions is whether the verdict is |₇supported by substantial evidence, direct or circumstantial. *Id.* Substantial evidence is evidence of sufficient certainty and precision to compel a conclusion one way or another and pass beyond mere suspicion or conjecture. *Id.*

On appeal, we review the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Id.* Moreover, we have held that the credibility of witnesses is a matter for the jury's consideration. *Id.*

■ Arkansas Code Annotated section 5–10–102(a)(2) (Repl.2006) provides that a person commits first-degree murder if, with the purpose of causing the death of another person, the person causes the death of another person. A person commits criminal attempt if the person purposely engages in conduct that constitutes a substantial step in a course of conduct intended or known to cause a particular result. Ark.Code Ann. § 5–3–201(b) (Repl.2006). A person acts purposely with respect to his conduct or a result of his conduct when it is the person's conscious object to engage in conduct of that nature or to cause the result. Ark.Code Ann. § 5–2–202(1) (Repl.2006).

■ Wells argues that he did not intend to shoot Rodriguez because he did not know Rodriguez personally; rather, he simply shot at anyone who opened the door of the trailer. A criminal defendant's intent or state of mind is seldom apparent. *Tarentino v. State*, 302 Ark. 55, 786 S.W.2d 584 (1990). One's intent or purpose, being a state of mind, can seldom be positively known to others, so it ordinarily cannot be shown by direct evidence, but may be inferred from the facts and circumstances. *Id.* Because intent cannot be proved by direct evidence, the fact-finder is allowed to draw upon common knowledge and experience to infer it from the circumstances. *Jones v. State*, 2009 Ark. App. 135, 2009 WL 464966. Due to the

---

3. At a competency hearing prior to trial, the prosecutor and defense counsel advised the judge that Wells was evaluated by two psychiatrists, one at the behest of the State and the other for the defense. Both psychiatrists opined that Wells did not suffer any mental disease or defect and was competent to stand trial. The trial court made a specific finding in that regard.

difficulty in ascertaining a defendant's intent or state of mind, a presumption exists that a person intends ⌊₈the natural and probable consequences of his acts. *Id.* Wells knocked on Rodriguez's door and fired a gun at Rodriguez when he opened the door. The jury could reasonably infer from these facts that Wells purposely engaged in conduct that constituted a substantial step in a course of conduct known to cause death to another person, regardless of that person's identity. We hold that substantial evidence supports Wells's conviction for attempted first-degree murder.

█ "[A] person commits a terroristic act if, while not in the commission of a lawful act, the person shoots at an occupiable structure with the purpose to cause injury to a person or damage to property." Ark.Code Ann. § 5–13–310(a)(2) (Supp. 2009)

Wells contends that he did not shoot at an occupiable structure; rather, he shot at Rodriguez. The evidence showed that, after initially shooting at Rodriguez, Wells fired his weapon two more times as Rodriguez was in the process of shutting his door. The natural and probable consequences of Wells's action in continuing to shoot as the door was closing resulted in the bullets striking Rodriguez's trailer, even though Wells aimed at Rodriguez with the purpose of causing personal injury. Accordingly, we hold that substantial evidence supports Wells's convictions for committing a terroristic act.

### Denial of Motion to Suppress Custodial Statement

█ Wells argues that the trial court erred in not suppressing his incriminating statement to Shepherd and Davis. Statements arising from custodial interrogation are presumed to be involuntary. *Britt v. State,* 83 Ark.App. 117, 118 S.W.3d 140 (2003). The burden is thus on the State to prove that a defendant knowingly and intelligently waived his privilege against self-incrimination and his right to an attorney and that he voluntarily made the statement. *Id.* ⌊₉In order to determine whether a waiver of *Miranda* rights is voluntary, this court looks to see if the confession was the product of free and deliberate choice rather than intimidation, coercion, or deception. *Grillot v. State,* 353 Ark. 294, 107 S.W.3d 136 (2003). Relevant factors to consider in determining whether a confession was involuntary are the age, education, and intelligence of the accused; the lack of advice as to constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of mental or physical punishment. *Cox v. State,* 345 Ark. 391, 47 S.W.3d 244 (2001). On appeal from the denial of a motion to suppress, we make an independent review based on the totality of the circumstances, but we defer to the trial court's superior position to determine the issue of the credibility of witnesses who testify to the circumstances of a defendant's custodial statement, and we will not reverse the trial court's findings of historical fact unless they are found to be clearly erroneous. *Britt, supra.*

At the suppression hearing, Shepherd testified that he interviewed Wells twice in connection with a homicide in Malvern.[4] After these interviews, Shepherd became aware of a similar homicide that took place

---

4. The trial court learned at the suppression hearing that Wells was a suspect in the murder of Mr. Northcutt in Malvern. At trial, however, the jury did not hear evidence regarding the Malvern homicide. Witnesses made no specific mention of it, and Wells's reference to it in his custodial statement was redacted. The trial court instructed the jury that the redacted portion of Wells's statement was not relevant to the current proceedings.

in Hot Springs on the day prior to the homicide in Malvern. Shepherd then interviewed Wells for a third time with Sergeant Davis present. Shepherd explained that the interview was not videotaped because the Hot Spring County jail did not have any recording equipment available. Shepherd testified that Wells did not appear to be under the influence of any intoxicating substance at the time he gave the statement and did not appear to be "operating under any kind of emotional disturbance." According to Shepherd, Wells cried and told him about the homicide in Hot Springs. Shepherd asked Wells if there was anything else he wanted to "clear up," and Wells told him about shooting at a Hispanic male in Malvern, who was later identified as Rodriguez.

Davis testified that Shepherd contacted him because a homicide in Malvern was similar to one that Davis was investigating in Hot Springs. Davis said that, prior to Wells's third interview with police, he advised Wells of his *Miranda* rights. Davis testified that he read each right to Wells, and Wells read along with Davis. Davis asked whether Wells understood each right, and Wells indicated that he did by placing his initials beside each right. Wells then signed the *Miranda*-rights form. Davis testified that, following Wells's confession, Davis allowed Wells to review the notes made during the interview, and Wells said, "that's great." Davis then typed the confession. After Davis corrected "a grammatical error" at Wells's

request, Wells initialed and signed the typed statement. Davis testified that he believed that Wells's confession was completely voluntary.

Following the suppression hearing, the trial court found that Wells's statement was "knowing, voluntary, intelligent, uncoerced," and thus denied Wells's motion to suppress the statement.

On appeal, instead of making an argument, Wells simply recites facts that he seems to suggest are relevant factors in determining whether his custodial statement was voluntary.[5] Wells points out that Shepherd interviewed him three times; Shepherd was a trained interviewer; Wells was emotional and crying during the interview; the interview at which Wells confessed was not taped; and Davis "completed a handwritten statement from making notes" that was signed by Wells.

To the extent Wells's argument is preserved, Wells was twenty-four years old at the time of his confession. Even at such a young age, Wells was no stranger to the criminal-justice system, in that he had five prior felony convictions. Both Shepherd and Davis testified that they advised Wells of his *Miranda* rights by reading each one to him and that Wells placed his initials beside each right, indicating that he understood.[6] Although Shepherd testified that he interviewed Wells a total of three times, the first two interviews pertained to a homicide in Malvern. Shepherd interviewed Wells only once in connection with the homicide in Hot Springs, at which time

---

**5.** Wells cites *Bisbee v. State*, 341 Ark. 508, 17 S.W.3d 477 (2000), for the proposition that this court should consider certain factors in looking at the vulnerability of the defendant. We note that, in *Bisbee*, the standard of review provided that the reviewing court makes an independent determination based upon the totality of the circumstances, "with all doubts resolved in favor of individual rights and safeguards." *Bisbee*, 341 Ark. at 511–12, 17 S.W.3d at 480. *Bisbee*, however, was specifi-

cally overruled by *Grillot, supra*, at which time our supreme court clarified the correct standard of review: "We make an independent determination based upon the totality of the circumstances." *Grillot*, 353 Ark. at 310, 107 S.W.3d at 145.

**6.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Wells gave the statement at issue, and Shepherd described the third interview as "relatively short." Wells reviewed Davis's handwritten notes, and after Davis had typed the statement, Wells was given yet another opportunity to read his statement. Wells was intelligent enough to recognize a purported grammatical error and, after the correction, Wells placed his initials beside each paragraph demonstrating his approval of the contents. These factors indicate that Wells's statement was voluntary. Finally, Wells cites no authority requiring video- or audio-taped confessions. *See United States v. Williams*, 429 F.3d 767 (8th Cir.2005) (declining to fashion rule mandating use of tape-recording equipment during custodial interrogations). Considering the totality of the circumstances, we hold that the trial court did not clearly err in denying Wells's motion to suppress his custodial statement.

### Admission of Rule 404(b) Evidence

A hearing was held on February 16, 2011, to address the State's motion to admit evidence regarding the homicide in Hot Springs pursuant to Ark. R. Evid. 404(b). Arkansas Rule of Evidence 404(b) (2012), provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The State argued that evidence of the homicide was admissible as evidence of other crimes, wrongs, or acts because the shell casing and bullet at the homicide matched those found at the scene of the attempted murder of Rodriguez. Also, the State argued that the evidence was relevant in connection with other facts in the chain of evidence. Wells objected, but at the conclusion of the arguments, the judge ruled that the evidence "fits almost precisely within 404(b)" because evidence of the Hot Springs homicide showed design, intent, identity, and absence of mistake or accident in the attempted murder of Rodriguez. In ruling the evidence admissible, the judge found it to be "absolutely direct and independently relevant evidence."

In analyzing the admission of evidence under Rule 404(b), our supreme court has stated that such evidence is not admissible simply to show a prior bad act. *Davis v. State*, 362 Ark. 34, 207 S.W.3d 474 (2005). To be admissible, the evidence must be independently relevant, which means it must have a tendency to make the existence of a fact of consequence to the determination of the case more or less probable. *Id.* Our supreme court has held that evidence is indisputably relevant if it proves a material point and is not introduced solely to prove that the defendant is a bad person. *Id.* Evidence admitted pursuant to Rule 404(b) must prove to not be too separated in time, making the evidence unduly remote. *Smith v. State*, 2010 Ark. 75, 364 S.W.3d 443. The trial judge is given sound discretion over the matter of remoteness and will be overturned only when it is clear that the questioned evidence has no connection with any issue in the case. *Id.* Our supreme court has held that evidence may be relevant in connection with other facts to form a link in the chain of evidence necessary to support a party's contention. *Id.* Furthermore, testimony can be relevant if it provides the necessary context for other evidence. *Id.* It is well settled that the admission or rejection of evidence is left to the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *Davis, supra.*

Wells argues that the trial court erred in admitting evidence of the Hot Springs homicide. In the argument section of his brief on appeal, defense counsel cites the standard of review and Ark. R. Evid. 403 but merely cut and pasted his oral argument from the pretrial hearing:

> Appellant argued that the part where he talks about the shooting in Mot Springs should not be admissible under 404b due to the fact that he's not been convicted of that crime and that it's happened after this crime and it's too prejudicial because once the jury hears that a murder has been committed somewhere else and they link him up to the murder, they're not really going to pay any attention to any of the rest of [the] evidence here because it's going to put nothing, nothing—puts fear in a jury or sticks in their mind as much as a murder will and that makes it too prejudicial for it to come in on the case where this is just a shooting. It's not a murder here and they will have a tendency to just where well, if you murder somebody over there and we link that up to here, they will automatically go the way-or he's guilty over here. That washed all the analysis or any judging the credibility of the evidence they present here, in the jury's minds is going to completely shut down on him. That will prevent my client from having a fair trial and a fair determination of the issues in this trial, violate his due process rights, and Your Honor, just to be frank about it, it's just plain unfair. They, have evidence here that they can put on that will carry their case if the jury believes it, it will just be unfair to let them put in a murder on my client in this case over here with no murder to let them do that. That will violate his constitutional rights. They haven't specified which one is admissible which one they're trying to show motive, intent, plan, absence of mistake or accident. They don't specify any one of them, they just want it to go in under something. So that's not fair because they have enough evidence here, if the jury believes it. . . .

 Admission of evidence about the Hot Springs homicide was unquestionably prejudicial to Wells. Although Wells argued that this evidence was "too prejudicial," which is essentially a Rule 403 argument,[7] the argument is not preserved for review. To preserve a point for appellate review, a party must obtain a ruling from the circuit court. *Anderson v. State*, 2011 Ark. 461, 385 S.W.3d 214. The burden of obtaining a ruling on an objection or motion is upon the movant, and the failure to secure a ruling constitutes a waiver, precluding its consideration on appeal. *Id.* Because Wells failed to obtain a ruling on the Rule 403 argument, we will not address it.

 As for Wells's argument that the trial court erred in admitting evidence of the Hot Springs homicide because the homicide did not occur *prior* to the attempted murder of Rodriguez, we note that the trial court remarked, "Makes no difference." We agree with the trial court's ruling. This court has recognized that Rule 404(b) also applies to evidence of subsequent bad acts by an appellant. *Fitting v. State*, 94 Ark.App. 283, 229 S.W.3d 568 (2006). The trial court did not abuse its discretion in admitting evidence of a homicide that occurred approximately fifteen hours after the attempted murder of Rodriguez.

7. Arkansas Rule of Evidence 403 provides that, although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

We will not consider any further arguments that can be extracted from defense counsel's statements at the pretrial hearing. We do not consider an argument, even a constitutional one, when the appellant presents no citation to authority or convincing argument in its support, and it is not apparent without further research that the argument is well taken. *Villagran v. State*, 2011 Ark. App. 769, 2011 WL 6189475.

Before we move to Wells's next argument, we note that Wells requested a limiting instruction with regard to the Rule 404(b) evidence at the pretrial hearing, and the trial court gave the following instruction prior to Mullin's and during Shepherd's trial testimony:

> [E]vidence of other alleged crimes, wrongs, or acts of a Defendant may not be considered by you to prove the character of a Defendant in order to show that he acted in conformity therewith. This evidence is not to be considered to establish a particular trait of character that he may have, nor is it to be considered to show that he acted similarly or accordingly on the day of the incident. This evidence is merely offered as evidence of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or accident. Whether any other alleged crimes, wrongs, [or] acts have been committed, is for you to determine.

For the reasons set forth above, and given this limiting instruction, we cannot say that the trial court abused its discretion in admitting evidence of the homicide in Hot Springs pursuant to Rule 404(b).

### Hearsay Objection

Finally, Wells argues that the trial court erred in overruling his objection to hearsay when Ussery testified as to what Rodriguez had told him. Hearsay is a statement, other than the one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted. Ark. R. Evid. 801(c) (2012). A trial court's ruling on the admissibility of evidence is entitled to great weight and will not be reversed absent an abuse of discretion. *Martin v. State*, 354 Ark. 289, 119 S.W.3d 504 (2003).

At trial, Ussery testified that the bullet holes or trajectory marks were consistent with Rodriguez's statement that he shut the door as Wells began shooting. The trial court overruled the objection and remarked that the testimony was "just formulated opinion." We agree. A witness not testifying as an expert may provide testimony in the form of opinions and inferences if those opinions and inferences are rationally based on the perception of that witness and are helpful to a clear understanding of the witness's testimony or a determination of a fact in issue. Ark. R. Evid. 701 (2012). Ussery was merely offering his opinion that the evidence at the scene was consistent with the victim's account of how Wells fired the gun at him and then into the door as it was being shut. We cannot say that the trial court abused its discretion in admitting Ussery's testimony. In any event, Ussery's testimony was merely cumulative to Rodriguez's testimony describing the actions he took upon being shot at by Wells. *Goss v. State*, 2011 Ark. App. 304, 2011 WL 1571462 (holding that, even if hearsay evidence is erroneously admitted, reversal is not required if the hearsay evidence is cumulative to other evidence admitted without objection).

Affirmed.

VAUGHT, C.J., and GLOVER, J., agree.