Cite as 2021 Ark. App. 182

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CR–20–324

| | |
|---|---|
| | **Opinion Delivered:** April 21, 2021 |
| LINQUINTON DEAN<br><br>APPELLANT<br><br>V.<br><br>STATE OF ARKANSAS<br>APPELLEE | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, FIRST DIVISION<br>[NO. 60CR-17-2531]<br><br>HONORABLE LEON JOHNSON, JUDGE<br><br>AFFIRMED |

## KENNETH S. HIXSON, Judge

Linquinton Dean appeals after he was convicted by a Pulaski County Circuit Court jury of domestic battering in the first degree and battery in the second degree. The jury found that appellant had committed both offenses in the presence of a child, and he was sentenced as a habitual offender to serve an aggregate of 780 months' imprisonment in the Arkansas Department of Correction. On appeal, appellant argues that (1) the circuit court abused its discretion when it denied defense counsel's hearsay objection to Dr. Christi Delcastillo-Hegyi's testimony that the victim told her in the course of a medical examination that her boyfriend had assaulted her; (2) the State failed to introduce substantial evidence that he committed second-degree battery in the presence of a child; (3) the circuit court erred when it denied defense counsel's motion for mistrial made during the State's closing argument; and (4) there is an inconsistency between the October 18, 2019, amended sentencing order and the circuit court's oral sentence pronouncement. We affirm.

## I. *Relevant Facts*

Appellant was charged by amended information with domestic battering in the first degree in violation of Arkansas Code Annotated section 5–26–303 (Repl. 2013), a Class B felony, and battery in the second degree in violation of Arkansas Code Annotated section 5-13-202(a)(4) (Supp. 2019), a Class D felony. The amended information further notified appellant that the State sought to enhance any punishment pursuant to Arkansas Code Annotated section 5-4-702 (Repl. 2013) as appellant committed each felony in the presence of a child and pursuant to Arkansas Code Annotated section 5-4-501(b) (Supp. 2019) as appellant was a habitual offender in that appellant had been previously convicted of four or more felonies.

These charges arose after law enforcement was called to respond to a disturbance at Kimara Lewis's apartment on June 15, 2017. When they arrived, appellant answered the door, holding a baby, A.B. A.B. had a cut above his bruised right eye, and his eye was swollen shut. Appellant told law enforcement that his girlfriend, referring to Ms. Lewis, was not at home and that A.B. had fallen. However, law enforcement eventually found Ms. Lewis in a bedroom sitting beside the bed naked and in the fetal position. Three additional children were found watching a movie in another bedroom. Ms. Lewis had been severely beaten. Blood was found on the floor and walls throughout the apartment and there was a hole in the wall of the bedroom where Ms. Lewis was found. Ms. Lewis was subsequently hospitalized for approximately six days and had sustained several injuries. A.B.'s forehead also needed stitches.

A three-day jury trial began on September 10, 2019; notably, Ms. Lewis refused to testify. Officer John Mack testified that he responded to a disturbance call at Ms. Lewis's apartment complex. When he arrived, he spoke with the apartment manager. Thereafter, Officer Mack knocked on Ms. Lewis's door, and appellant answered with the security chain still connected to the door. Appellant told Officer Mack and Officer Mack's partner, Officer Parker, that no one else was in the apartment. Once appellant let them into the apartment, Officer Mack saw that A.B.'s right eye was bruised and had a cut above it. Appellant told them that "his girlfriend had left the apartment and the baby had fell." At that point, Officer Mack stayed with appellant while Officer Parker searched the rest of the apartment. Officer Parker located the injured Ms. Lewis in the bedroom. When Officer Parker returned, he advised Officer Mack to place appellant under arrest. Officer Mack placed appellant in his vehicle. While appellant was inside Officer Mack's vehicle, appellant claimed that several other "black females" had beaten Ms. Lewis "with sticks and pipes."

Officer Michael Murmert testified that he arrived at the scene after Officer Mack had taken appellant into custody and was still in the parking lot. Officer Murmert then went inside the apartment to assist Officer Parker. Officer Murmert testified that the apartment was a small two- or three-bedroom apartment. He observed blood on the tile by the front door and down the hallway leading to the bedroom where Ms. Lewis was located. He stated that there were three other children watching a movie in another bedroom, which was approximately twenty or thirty feet from Ms. Lewis's bedroom. Officer Murmert determined the three children did not see the fight between appellant and Ms. Lewis. In

3

Ms. Lewis's bedroom, Officer Murmert observed blood on the walls and a hole in the wall next to the closet door.

Meagan Buchert, a crime specialist with the Little Rock Police Department, testified that she observed blood "inside the entrance of the apartment, as well as in the hallway from the living quarters to the bedrooms, as well as outside and inside the bedroom and the attached bathroom." She also noticed several broken items in the living room, including a broken metal pole and a broken wooden board that appeared to be a wooden beam or bed rail. She found another broken board in the bedroom.

Chaundra Hegwood, a paramedic for MEMS ambulance, testified that she attended to A.B. at the scene while her partner treated Ms. Lewis. She eventually learned that A.B. was approximately one year old. She explained that A.B.'s eye was swollen shut, and the side of his face was swollen. A.B. had blood on his hands and a laceration above his eye. Ms. Hegwood was told that A.B. had been hit with a stick. Ms. Hegwood also testified that she later attended to Ms. Lewis. Ms. Lewis had multiple injuries. She had a swollen eye, appeared to have two broken arms, bruising on her thigh, bruising on her arm, and an avulsion on her buttocks.

Amanda Burks, another paramedic for MEMS ambulance, testified that she initially treated Ms. Lewis. When she entered Ms. Lewis's bedroom, she saw that Ms. Lewis was "beside the bed on the floor sitting down, drawn in the fetal position, naked." She noticed that Ms. Lewis had swelling to her face and eye, an abrasion to her face, a penetrating wound to her left upper arm, an avulsion on her bottom, and a welt on her leg. She also noticed that there was a stick-like object on the floor beside the wall and blood splatters on the wall.

4

Ms. Burks testified that she recalled seeing two other children besides A.B. in the apartment who appeared to be "[m]aybe five, six to -- five to eight-ish."

Ms. Lewis and A.B. were transported from the scene by ambulance. A.B. was transported to Arkansas Children's Hospital, and Ms. Lewis was transported to CHI St. Vincent Infirmary. Ms. Burks testified that she noticed additional injuries once Ms. Lewis was in the ambulance. She noticed that both of Ms. Lewis's forearms appeared to be broken. She also saw multiple avulsions on Ms. Lewis's arms, buttocks, and breast. Ms. Lewis also had multiple abrasions and swelling. Ms. Burks testified that, in her opinion, Ms. Lewis had sustained "serious injuries."

Dr. April Clawson, a physician in the emergency department at Arkansas Children's Hospital, testified that she treated A.B. She was told that A.B.'s mother had been assaulted with a bed rail or broom handle. Dr. Clawson testified that A.B. had signs of head trauma with swelling around his right eye and a small shallow laceration above his right eyebrow.

Dr. Christi Delcastillo-Hegyi, an emergency physician at CHI St. Vincent Infirmary, testified that she had treated Ms. Lewis. Dr. Delcastillo-Hegyi testified that Ms. Lewis told her that she had received her injuries after being punched, kicked, and hit multiple times with a stick. Over defense counsel's objection, Dr. Delcastillo-Hegyi testified that Ms. Lewis had told her that it was Ms. Lewis's "boyfriend" who had committed the assault. Dr. Delcastillo-Hegyi testified that Ms. Lewis had the following injuries:

> I observed a left periorbital or around her eye swelling, bruising, you know, injuries to − lacerations and bruises to both her arms, her legs. She had a laceration to her right breast. Those are the major ones. . . . So left face, left scalp, left periorbital area around the eye, both arms, both legs, both breasts, her back. She had an abrasion to her lower back. . . . a two-centimeter laceration to the right breast, which we later determined was a stab wound. One and a half centimeter -- two one-and-a-half

5

centimeter lacerations to the left upper arm, several puncture wounds to the left posterior and lateral thigh, so the back and the left -- the outside of the thigh, of the left thigh. Abrasions over the back and the right thigh, there was a kind of skin tear.

Dr. Delcastillo-Hegyi further testified that Ms. Lewis required two units of red blood cells and a chest tube to prevent her lung from collapsing and from having a life-threatening internal hemorrhage. Some of the lacerations needed sutures. She explained that some of the jagged lacerations were consistent with blunt-force trauma with an object like a stick. After conducting tests, it was determined that Ms. Lewis did not have any broken bones.[1] Dr. Delcastillo-Hegyi opined that the injuries Ms. Lewis had sustained could have potentially been life-threatening.

Sergeant Scott Anthony Thomisee, an investigator at the Pulaski County Regional Detention Facility, testified that his job entails monitoring jail phone calls and conducting surveillance at the jail. Sergeant Thomisee testified that appellant's PIN and password were used to make several outbound phone calls from the jail. Those phone calls were recorded and subsequently delivered to the investigators.

Sergeant Brittany Gunn testified that at the time of the incident, she was the detective assigned to investigate this case. She testified that after interviewing Ms. Lewis on the day of the incident, she returned to her office and interviewed appellant after reading him his *Miranda* rights. Because appellant became extremely irate and refused to answer any additional questions, she stopped the interview. Sergeant Gunn testified that at that point, appellant was arrested and charged. Sergeant Gunn explained that later in the investigation

---

[1]Multiple pictures of both victims' injuries were admitted throughout the trial.

6

she was given the phone-call recordings from the jail and listened to them. She stated that from her investigation, she recognized the two voices on the phone calls as being the voices of appellant and Ms. Lewis. An excerpt from one of the phone calls was played for the jury at trial.

During the phone call, appellant told Ms. Lewis, "I apologize for all that[.]" Ms. Lewis told appellant that she had apologized for what she did but that it "didn't give [appellant] the right to . . . beat [her]." Ms. Lewis further accused appellant of trying to kill her and told him that she had to have a tube inserted to help her breathe. Ms. Lewis's description of her injuries was consistent with the injuries described during Dr. Delcastillo-Hegyi's testimony. When Ms. Lewis told appellant that her arm was not broken as was thought, appellant responded, "I ain't do too much then. I thought I'd be out . . . that shit was fucked up." After the phone call was played for the jury, Sergeant Gunn stated that there were hundreds of similar phone calls that were recorded.

Thereafter, the State rested, and defense counsel moved for a directed verdict. In summary, counsel argued regarding the charge of first-degree domestic battering that there was no eyewitness testimony that appellant was the perpetrator in this case, no evidence that appellant and Ms. Lewis had been in a dating relationship, and no evidence that Ms. Lewis's injuries constituted a "serious physical injury" as required. Regarding the second charge of battery in the second degree, defense counsel argued that there was no evidence that appellant had injured A.B. Defense counsel also moved for a directed verdict as to the present-child enhancements. Specifically, he argued that law enforcement testified that the other children were in another room watching television when the incident occurred. He

7

further explained that there was no evidence about how loud the incident was or if based on the State's evidence that the other children were even aware that the incident had occurred. The circuit court denied these motions.

Appellant offered the testimony of Sergeant Lesa Warner. Sergeant Warner testified that she did not have any independent, personal knowledge of visitations that may have taken place between Ms. Lewis and appellant while appellant was in jail. She explained that any knowledge she had would be according to what the jail records indicated.

After appellant rested his case, defense counsel renewed his motions for directed verdict, which were denied. The jury found appellant guilty of both offenses and found that he had committed those offenses in the presence of a child. Appellant was sentenced as a habitual offender and with all enhancements to serve an aggregate of 780 months' imprisonment in the Arkansas Department of Correction.[2] This appeal followed.

## II. *Second-Degree Battery in the Presence of a Child*

We must address appellant's second argument first because double-jeopardy considerations require this court to review a challenge to the sufficiency of the evidence before we review the other issues on appeal. *Martin v. State*, 2018 Ark. App. 143, 545 S.W.3d 785. We treat a motion for a directed verdict as a challenge to the sufficiency of the evidence. *Armstrong v. State*, 2020 Ark. 309, 607 S.W.3d 491. In reviewing a sufficiency challenge, we assess the evidence in the light most favorable to the State and consider only

---

[2]After the record was lodged with this court, we granted the State's motion to supplement the record with an amended sentencing order that was filed on April 17, 2020. This amended sentencing order is the most recent order and accurately reflects appellant's aggregate sentence of 780 months' imprisonment as imposed by the circuit court.

8

the evidence that supports the verdict. *Id*. We will affirm a judgment of conviction if substantial evidence exists to support it. *Id*. Substantial evidence is evidence that is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other without resorting to speculation or conjecture. *Id*. Circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Id*. Whether the evidence excludes every other hypothesis is left to the jury to decide. *Id*. Further, the credibility of witnesses is an issue for the jury, not the court; the trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Id*.

A criminal defendant's intent or state of mind is seldom apparent. *Wells v. State*, 2012 Ark. App. 596, 424 S.W.3d 378. One's intent or purpose, being a state of mind, can seldom be positively known to others, so it ordinarily cannot be shown by direct evidence, but may be inferred from the facts and circumstances. *Id*. Because intent cannot be proved by direct evidence, the fact-finder is allowed to draw upon common knowledge and experience to infer it from the circumstances. *Id*. Due to the difficulty in ascertaining a defendant's intent or state of mind, a presumption exists that a person intends the natural and probable consequences of his acts. *Id*.

On appeal, appellant argues that the State failed to introduce substantial evidence that he committed second-degree battery in the presence of a child. He does not challenge the sufficiency of the evidence that he committed the second-degree battery. Instead, his only argument concerns the sentence enhancement applied to the charge of battery in the second

9

degree. Appellant specifically argues that the State failed to introduce substantial evidence that the three other children in the apartment were "physically" present during the incident or that appellant knew or had reason to know that they were present and may have seen or heard appellant's act of battery. We disagree.

A person who commits any of the offenses enumerated in Arkansas Code Annotated section 5-4-702, including a felony offense of battery, may be subject to an enhanced sentence of an additional term of imprisonment of not less than one year and not greater than ten years if the offense is committed in the presence of a child. Ark. Code Ann. § 5-4-702(a). A "child" is defined as a person under eighteen years of age. Ark. Code Ann. § 5-4-701(1) (Repl. 2013). "In the presence of a child" is defined as "the physical presence of a child or *knowing or having reason to know* that a child is present and *may see or hear* an act." Ark. Code Ann. § 5-4-701(6) (emphasis added).

In other words, the enhancement statute requires proof that the defendant knew or had reason to know that a child was present at the commission of the offense. Here, the jury was instructed on this enhancement:

> The State has alleged that Linquinton Dean committed the offense of Battering in the Second Degree in the Presence of a Child.
>
> To sustain this allegation, the State must prove beyond a reasonable doubt that Linquinton Dean committed the offense of Battering in the Second Degree *knowing or having reason to know* that a person under 18 years of age was present and *may see or hear* an act of Battery in the Second Degree.

(Emphasis added.) When a statute provides that a defendant must know or have reason to know a fact, the defendant's knowledge may be inferred from the circumstances. *Williams v. State*, 2019 Ark. App. 152, 573 S.W.3d 547.

The jury heard testimony that appellant and Ms. Lewis were not strangers but were in a dating relationship. Appellant even referred to Ms. Lewis as his girlfriend when he answered the door of her apartment holding her child on the day of the incident. At that time, he was untruthful to law enforcement when he told them that no one else was in the apartment. However, both Officer Murmert and Ms. Burks testified that Ms. Lewis and other children were found in the apartment. Officer Murmert testified that the apartment was a small two- or three-bedroom apartment. He observed blood on the tile by the front door and down the hallway leading to the bedroom where Ms. Lewis was located. Therefore, the extent of the battery was not confined to the one bedroom—evidence of the battery was found throughout the apartment. Officer Murmert stated that there were three other children watching a movie in another bedroom approximately twenty or thirty feet from Ms. Lewis's bedroom. He also observed blood on the walls and a hole in the wall next to the closet door of Ms. Lewis's bedroom. Ms. Burks testified that she recalled seeing two other children besides A.B. in the apartment who appeared to be "[m]aybe five, six to -- five to eight-ish." This was sufficient evidence from which the jury could infer that appellant had reason to know that children under the age of eighteen were present and could *see or hear* the act of second-degree battery that he inflicted on A.B. We therefore hold that the circuit court did not err in denying appellant's motion for directed verdict on the enhancement for committing the offense of second-degree battery in the presence of a child, and we affirm on this point.

### III. *Hearsay Objection*

Appellant next argues that the circuit court abused its discretion when it denied defense counsel's hearsay objection to Dr. Delcastillo-Hegyi's testimony that Ms. Lewis told her in the course of a medical examination that her "boyfriend" had assaulted her. The decision to admit or exclude evidence is within the sound discretion of the circuit court, and we will not reverse a circuit court's decision regarding the admission of evidence absent a manifest abuse of discretion. *Rodriguez v. State*, 372 Ark. 335, 276 S.W.3d 208 (2008). Moreover, we will not reverse absent a showing of prejudice. *Id.*

"Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ark. R. Evid. 801(c). Hearsay is not admissible except as provided by law or by the rules of evidence. Here, the State argued that Dr. Delcastillo-Hegyi's statement was admissible as an exception to the hearsay rule pursuant to Ark. R. Evid. 802. Arkansas Rule of Evidence 803(4) provides an exception to the rule against hearsay for statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensation, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

In *Flores v. State*, 348 Ark. 28, 69 S.W.3d 864 (2002), our supreme court adopted a test that was articulated by the Eighth Circuit in *United States v. Iron Shell*, 633 F.2d 77 (8th Cir. 1980), to assist in determining whether hearsay evidence fits within the medical-treatment exception under Arkansas Rule of Evidence 803(4). The two-prong test asks first, is the declarant's motive consistent with the purpose of the rule; and second, is it

12

reasonable for the physician to rely on the information in diagnosis or treatment. *Flores, supra.* After applying this test to the facts in *Flores*, our supreme court determined that, under the medical-treatment exception, the circuit court properly admitted the mother's statement to the doctor concerning the fact that the child was physically abused but had improperly admitted the portion of the testimony that identified Flores as the child's attacker. *Id.* It explained that the identification of the perpetrator was not used by the physician in the diagnosis or treatment of the child's injuries. Accordingly, it concluded that the statement identifying the perpetrator was improperly admitted pursuant to Rule 803(4). *Flores, supra.* In other cases, our supreme court has expressly held that "the medical-treatment exception to the hearsay rule permits hearsay identifying the perpetrator in the special case of a child–abuse victim *where the abuser is a member of the child's immediate household* and the statement is made in the course of a medical examination for the purpose of diagnosis and treatment." *Elliott v. State*, 2010 Ark. App. 809, at 6, 379 S.W.3d 101, 105 (citing *Hawkins v. State*, 348 Ark. 384, 72 S.W.3d 493 (2002)) (emphasis added).

Appellant argues that Ms. Lewis was not a child victim and that there was no evidence that appellant lived in the same household as Ms. Lewis. Therefore, under *Flores*, he argues that Dr. Delcastillo-Hegyi should not have been allowed to testify that Ms. Lewis told her that her "boyfriend" was the perpetrator (which, in turn, identified appellant as the perpetrator from other evidence presented at trial). The State nevertheless argues in part that Dr. Delcastillo-Hegyi's testimony was admissible under the medical-treatment exception to the hearsay rule because Dr. Delcastillo-Hegyi also testified that she needed to

13

"know who assaulted the patient" in order to provide treatment.  Dr. Delcastillo-Hegyi explained that she needed to know the assailant's identity

> in order to assess whether the patient continues to have a safety issue, is going to be repeatedly exposed to the assailant.  I need to know if there are other people involved, including children and other family members that this assailant, alleged assailant, may potentially pose a risk to, a threat to.  That's -- those are the main concerns. And that would help me recruit social work, as well law enforcement, to secure the safety of all people involved, as well as staff in the emergency room, if that's required.

We agree with appellant that the circuit court abused its discretion in permitting Dr. Delcastillo-Hegyi to testify that Ms. Lewis identified her boyfriend as her assailant under *Flores* and Rule 803(4).  Further, the facts of this case are not like those in *Hawkins*, which our supreme court recognized was a special case.  *See Hawkins*, *supra*.  In *Hawkins*, our supreme court explained that Rule 803(4) applied because R.T.'s identification of Hawkins as her abuser allowed Dr. Hawawini to take steps to prevent further abuse by her stepfather, who was a member of her household; R.T.'s identification of appellant as her abuser allowed Dr. Hawawini to take steps to treat the emotional and psychological injuries that accompanied the rape; R.T.'s statements led to Dr. Hawawini's referral to a physician at Arkansas Children's Hospital who specialized in treating children who are sexually abused; and R.T.'s identification of appellant as her abuser permitted Dr. Hawawini to fulfill her legislatively imposed duty of calling the child-abuse hotline and reporting the crime.  Here, Ms. Lewis is not a minor victim; there was no testimony that appellant lived in Ms. Lewis's household; and although Dr. Delcastillo-Hegyi testified that she needed to know the assailant's identity, she did not testify that Ms. Lewis's identification led her to treat Ms. Lewis any differently.  Under these facts, we cannot say that the second prong of the

14

*Flores* test was satisfied. It was not reasonable for Dr. Delcastillo-Hegyi to rely on Ms. Lewis's identification of her boyfriend in diagnosis or treatment. Where such information is not relevant for diagnosis but rather an attempt to fix blame, it must be excluded. *Id.* Accordingly, we conclude that the circuit court erred in allowing Dr. Delcastillo-Hegyi to testify that "the boyfriend" assaulted Ms. Lewis.

That said, even though we agree with appellant that the circuit court erred in permitting Dr. Delcastillo-Hegyi to testify that the victim told her in the course of a medical examination that her boyfriend had assaulted her, we must nevertheless agree with the State that this was harmless error. Our supreme court has said that even when a circuit court errs in admitting evidence, this court will affirm the conviction and deem the error harmless if there is overwhelming evidence of guilt and the error is slight. *Eastin v. State*, 370 Ark. 10, 257 S.W.3d 58 (2007). To determine if the error is slight, this court looks to see whether the defendant was prejudiced by the erroneously admitted evidence. *Id.* Prejudice is not presumed, and this court will not reverse a conviction absent a showing of prejudice by the defendant. *Gaines v. State*, 340 Ark. 99, 8 S.W.3d 547 (2000). No prejudice results when the evidence erroneously admitted was merely cumulative, and we do not reverse for harmless error in the admission of evidence. *Id.*; *see Elliott*, *supra*; *Wright v. State*, 368 Ark. 629, 249 S.W.3d 133 (2007).

Here, Dr. Delcastillo-Hegyi's testimony regarding the identity of Ms. Lewis's assailant was cumulative to the admission of other evidence. In the recorded phone conversation between appellant and Ms. Lewis that was also admitted into evidence, appellant specifically told Ms. Lewis, "I apologize for all that[.]" Ms. Lewis told appellant

15

that she had apologized for what she did but that it "didn't give [appellant] the right to . . . beat [her]." Ms. Lewis further accused appellant of trying to kill her and told him that she had to have a tube inserted to help her breathe. When Ms. Lewis told appellant that her arm was not broken as was thought, appellant responded, "I ain't do too much then. I thought I'd be out . . . that shit was fucked up." Therefore, even though appellant attempted to downplay the severity of his actions, the jury heard evidence that not only had Ms. Lewis identified appellant as her assailant but also that appellant had discussed his participation in the incident. Additionally, the jury heard testimony that appellant had answered the door to law enforcement immediately after the incident while holding A.B., who had blood on his hands. At that point, appellant told law enforcement that his girlfriend was not in the apartment. Appellant was obviously untruthful to law enforcement because Ms. Lewis was subsequently found in the bedroom, severely beaten. Further, blood was found near the front door, on the floor, and on the walls throughout the apartment, and there was a hole in the wall of the bedroom where Ms. Lewis was found. Accordingly, because the admission of Dr. Delcastillo-Hegyi's testimony was harmless error due to its cumulative nature, we affirm on this point.

III. *Closing Argument*

Appellant additionally argues that the circuit court erred when it denied defense counsel's motion for mistrial made during the prosecutor's closing argument. During closing argument, the prosecutor made the following statements to the jury:

> That's all you have to take away from this. This isn't hard. There's no victim -- I mean, you didn't hear a victim testify. It's what we talked about in voir dire, everyone could come up with a reason why not only will the victim go back repeatedly to their abuser, but why they might not want to testify. And I'm not

16

excusing it, I'm not saying it's –– is it right or wrong. But you all said why. Everyone gave a different reason. There are shortcomings you feel she may have. The fact of the matter is that I asked you if you could obey the law, if you could only consider the evidence presented to you. And the evidence presented to you has been very clear, that he caused serious physical injury to Kimara Lewis and knowingly caused physical injury to [A.B.]. *And there's not -- no doubt about that and there's going to be nothing to rebut that, nothing. So there's there's no evidence to give a reasonable explanation for any of these injuries or for his conduct and for that reason, we ask that you find the Defendant guilty.*

(Emphasis added.) Defense counsel moved for a mistrial and argued that the prosecutor had implied that the burden had shifted to appellant instead of remaining with the State. He further argued that a mistrial was warranted because the prosecutor was "referring to the Defendant failing to put up proof." The prosecutor disagreed and explained that it was not insinuating anything other than the fact that there "was no explanation." The circuit court denied the request for a mistrial.

On appeal, appellant argues that the prosecutor's statements were a comment on his failure to testify and violated his constitutional right not to incriminate himself. Citing *Aaron v. State*, 312 Ark. 19, 846 S.W.2d 655 (1993), appellant argues that a prosecutor may not comment on the uncontradicted nature of the evidence when it is highly unlikely that anyone other than the defendant could rebut the evidence. Therefore, he argues that the circuit court's failure to grant his motion for mistrial was reversible error. We disagree.

A mistrial is an extreme remedy that should not be declared unless there has been error so prejudicial that justice cannot be served by continuing the trial or when the fundamental fairness of the trial itself has been manifestly affected. *Britton v. State*, 2014 Ark. 192, 433 S.W.3d 856. The circuit court has wide discretion in granting or denying a motion for mistrial, and absent an abuse of that discretion, the circuit court's decision will not be

17

disturbed on appeal. *Britton, supra.* Among the factors we consider on appeal is whether the defendant requested a cautionary instruction or an admonition to the jury. *Bragg v. State*, 328 Ark. 613, 946 S.W.2d 654 (1997). Our supreme court has held that a cautionary instruction or an admonition to the jury can make harmless any prejudice that might occur. *See Green v. State*, 2013 Ark. 497, 430 S.W.3d 729. A mistrial is proper only when an error is beyond repair and cannot be corrected by any curative relief. *McClinton v. State*, 2015 Ark. 245, 464 S.W.3d 913. The failure of the defense to request an admonition may negate the mistrial motion. *Bragg, supra.* It is also true that the failure to give an admonition or a cautionary instruction is not error if none is requested. *Id.* "The bottom line on mistrials is that the incident must be so prejudicial that the trial cannot, in fairness, continue." *Boyd v. State*, 318 Ark. 799, 804, 889 S.W.2d 20, 22 (1994).

When a prosecutor is alleged to have made an improper comment on a defendant's failure to testify, the statements are reviewed in a two-step process. *Jefferson v. State*, 372 Ark. 307, 276 S.W.3d 214 (2008). First, we determine whether the comment itself is an improper comment on the defendant's failure to testify. *Id.* Even a veiled reference to the defendant's failure to testify is improper. *Id.* The basic rule is that a prosecutor may not draw attention to, or comment upon, the defendant's failure to testify. This is to prevent the defendant from testifying against himself in violation of the Fifth Amendment. *Id.* Second, if we determine that the prosecution's remark was not proper under this analysis, then we determine whether it can be shown beyond a reasonable doubt that the error did not influence the verdict. *Id.*

We agree with the State that the prosecutor's statements during closing argument were not a comment upon, or a veiled reference to, appellant's failure to testify, nor did it shift the burden of proof to appellant. An expression on the part of the prosecuting attorney attributable to the weight to be given evidence can be distinguished from an expression or a gesture indicating to the jury that the defendant has not taken the witness stand. *See Nalls v. State*, 2013 Ark. App. 183. Although the prosecutor's arguments may have edged toward territory that is best avoided, the prosecutor did not cross the line into impermissible comments. The witnesses were consistent in their testimony that the victims' injuries were the result of being beaten with a stick. Moreover, although appellant did not testify, the statements he made on the recorded phone calls were introduced, which also implicated him as the perpetrator. The prosecutor's statements, in our view, were nothing more than a comment on the strength and undisputed nature of the evidence. Such remarks are not improper. *See Richmond v. State*, 320 Ark. 566, 572, 899 S.W.2d 64, 67 (1995) (stating that a prosecutor may mention the fact that the State's evidence has remained undisputed); *Beebe v. State*, 301 Ark. 430, 435–36, 784 S.W.2d 765, 768 (1990) (concluding that the prosecutor's statement "I submit to you that that evidence has not been disputed" was not necessarily a comment on the defendant's failure to testify); *Davis v. State*, 174 Ark. 891, 893, 298 S.W. 359, 360 (1927) (holding that prosecutor's statement in closing argument—that there was no denial that there was other evidence in the case beyond the evidence presented by the State—did not constitute a comment upon the failure of the defendants to testify but rather was an argument that the State's evidence should be believed because it was undisputed); *Markham v. State*, 149 Ark. 507, 513, 233 S.W. 676, 679 (1921) (holding

19

that remarks of the prosecuting attorney—that testimony tending to prove the guilt of the accused was uncontradicted—should not be construed as a comment upon the failure of the defendants to testify but rather as an expression of the prosecutor's opinion as to the weight of the State's evidence); *Davidson v. State*, 108 Ark. 191, 211–12, 158 S.W. 1103, 1110 (1913) (rejecting the defendant's claim that the prosecutor's closing argument, which called on the defense to explain undisputed witness testimony, was a comment on the defendant's failure to testify; holding that it was the expression of the opinion of counsel that the testimony had not been rebutted and should be accepted as true).

Moreover, even if we were to find that the prosecutor's comments were impermissible, we are convinced that any error did not influence the verdict. The failure to give an admonition or a cautionary instruction is not error when none is requested; here, although appellant requested a mistrial, he did not request an admonition to the jury. *See Barnes v. State*, 346 Ark. 91, 55 S.W.3d 271 (2001). That said, the circuit court specifically instructed the jury that "[o]pening statements, remarks during the trial and closing arguments of attorneys are not evidence, but are made only to help you in understanding the evidence and applicable law. Any argument, statements or remarks of attorneys having no basis in the evidence shall be disregarded by you." The jury was also instructed that appellant was presumed to be innocent and that "[a] Defendant has an absolute constitutional right not to testify. The fact that Linquinton Dean did not testify is not evidence of guilt or innocence and under no circumstances shall be considered by you in arriving at your verdict." We have previously held that a similar admonition to the jury at the conclusion of the trial cured any possible error of improper comments that the prosecutor made during

20

opening arguments. *See Nalls*, *supra*. Thus, we agree with the State that the circuit court did not abuse its discretion in denying appellant's motion for mistrial, and we affirm on this point.

## IV. *Sentence*

Appellant lastly argues that there is an inconsistency between the October 18, 2019, amended sentencing order and the circuit court's oral sentence pronouncement. However, appellant concedes in his reply brief that relief under this point is no longer required. The circuit court's October 18, 2019, amended sentencing order is not the most recent amended sentencing order filed in this case. On November 18, 2020, we granted the State's motion to supplement the record on appeal with a certified copy of an amended sentencing order that was filed in the circuit court in this case on April 17, 2020. That amended sentencing order was filed one month before the record on appeal was lodged in this court on May 18, 2020. As appellant concedes, the April 17, 2020, amended sentencing order is consistent with the circuit court's oral pronouncement, and any relief he might have requested on the erroneous sentence contained in the October 18, 2019, amended sentencing order is no longer warranted. As such, we affirm.

Affirmed.

GLADWIN and BARRETT, JJ., agree.

*William R. Simpson, Jr.*, Public Defender, by: *Clint Miller*, Deputy Public Defender, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Brad Newman*, Ass't Att'y Gen., for appellee.