Cite as 2025 Ark. App. 275

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CR-24-90

| | | |
|---|---|---|
| | | **Opinion Delivered** April 30, 2025 |
| DANNY HOPPER | | APPEAL FROM THE CRAWFORD |
| | APPELLANT | COUNTY CIRCUIT COURT |
| | | [NO. 17CR-22-455] |
| V. | | |
| | | HONORABLE MARC MCCUNE, |
| | | JUDGE |
| STATE OF ARKANSAS | | |
| | APPELLEE | AFFIRMED IN PART; DISMISSED IN |
| | | PART |

**KENNETH S. HIXSON, Judge**

Appellant Danny Hopper was convicted in a jury trial of first-degree terroristic threatening and was sentenced as a habitual offender to eleven years in prison. Pursuant to Ark. Code Ann. § 5-13-301(a)(1)(A) (Repl. 2024), a person commits first-degree terroristic threatening if, with the purpose of terrorizing another person, the person threatens to cause death or serious physical injury or substantial property damage to another person. Hopper's conviction was based on evidence that on February 10, 2022, he left a voicemail threatening to kill Jason Webb.

Hopper now appeals from his conviction, raising four arguments for reversal. Hopper argues that (1) his trial counsel was ineffective, (2) there was insufficient evidence to support the verdict, (3) the trial court failed to properly instruct the jury on terroristic threatening,

and (4) the record on appeal appears to be incomplete and contradictory. We affirm in part and dismiss in part.

## I. *Relevant Facts*

Danny Hopper was married to Pamela Hopper (now Han) from 2015 until they divorced in 2022. During the marriage, Hopper and Pamela were members of the Van Buren Kingdom Hall of Jehovah's Witness congregation. In 2021, Pamela consulted three elders of Van Buren Kingdom Hall regarding her marital problems. One of these elders was Jason Webb.

Pamela testified that when Hopper learned that she was consulting the church elders about their marriage, he became upset and claimed that she was conspiring with the elders. According to Pamela, Hopper thought that the elders were encouraging her to divorce him so she could get half of their property and give it to them, which she said was not true. Pamela stated that after she separated from Hopper, he sent her numerous emails wherein he disparaged and threatened to harm Webb. She stated that "many of the things [Hopper] said were disparaging, but one thing he said for sure is that he wanted to rip [Webb's] head off." Pamela testified further that she knows Hopper to be

> a very violent, a very controlling, a very angry individual. A very vulgar, a very unhappy person who enjoys spreading misery. He victimizes people, particularly people that he thinks he is superior to.

Webb testified that he, his wife, and their two children moved from Florida to Crawford County, Arkansas, in the summer of 2019 and that he became an elder at Van Buren Kingdom Hall a few months after that. Webb described his role as an elder as one

who shepherds the congregation and assists members in their relationship with God. Webb stated that when he is asked for assistance, he does not tell the person what to do but shepherds with Bible scriptures and lets the person make his or her own decision, which is between that person and God.

Webb recalled the occasion when Pamela approached him and two other elders about her marital issues. Webb stated that his involvement with Pamela lasted only about five minutes and that he shared a scripture with her and advised her that whether she separated from Hopper was her decision. Webb stated that he left the decision to Pamela and did not try to persuade her.

Webb stated that, after his brief consultation with Pamela, Hopper began sending him numerous emails, texts, and voicemails. Webb stated that Hopper accused him of encouraging Pamela to leave Hopper and having an affair with Pamela, both of which were untrue. When asked how many emails, texts, and voicemails Hopper had sent him, Webb stated, "There are so many I can't even count them." Webb stated further that Hopper sent a group email to the congregation making disparaging remarks about him and saying "basically, I'm nothing but dirt."

Webb stated that these communications from Hopper went on for about a year and that it was not until after Hopper left a voicemail threatening to hurt him and "put [him] six [feet] under the ground" that he made a report to law enforcement. Hopper sent this voicemail to Webb on February 10, 2022, and the recording was played to the jury:

3

Hi Jason, this is Danny again.  I was just thinking, I was—you know nobody would even listen to anything I had to say about Pamela's behavior at home.  She's got a narcissistic personality disorder—every one of the traits that those folks have, she has it, and I was willing to put up with her, you know.

It just needed to be known that she's a pathological liar and twists everything to make herself the victim.  But y'all—you wouldn't want to hear that because your goal was to get my property.  So, anything—I mean, she's a mentally ill woman, Jason, and you're taking—you've got control of her.

You're taking advantage, in Jehovah's name, of a mentally ill person to try to get the property for yourself, for a discount.

Even if you were to succeed, you would not be able to enjoy it for very long because I'd put you six foot under the ground.

Now, go get me disfellowshipped or whatever, but it's not going to stop me.  So, if you do succeed, you will not survive.  You understand?  It ain't worth it, boy.  You've messed with the wrong man and the wrong man's wife.

So go ahead and get me disfellowshipped or whatever, knock yourself out.  That's what you wanted, so go for it.  You're still not gonna get my property, and if you do, you're not going to enjoy it, Jack.

That's crazy for a man, an elder, to use a man's wife, a mentally ill wife to take advantage of her and to try to take the man's property and think you would survive it.  That's ludicrous.  I mean, how do you expect a person to react to something like that?

Oh, I'm sorry, here take my property.  Excuse me for being here.  Hope you have a nice day.

No, that's what I would like to do.  I wouldn't hurt a little fat cell of your membrane there.

That's what I would like to do.  It's crazy that—it's crazy—it's beyond moral sense that a man representing Jehovah would come up with such a scheme.  How many people have people in your organization done that to?  How many couples?

It must be an ongoing deal because you're not smart enough to come up with it on your own.  It's gotta be an organizational thing that the elders do to manipulate

people. There's something—you're very seriously disturbed in the head to take advantage of a man's wife like that, that's got a mental illness so you can try to [get] a place to live so you can be close to your buddy. I mean, that's just—that's just plumb crazy. I would not let you survive that.

Webb testified that he thought Hopper left this voicemail with the intent to terrorize him and that it "most definitely" put him in a state of fear. Webb stated that Hopper caused him worry, sleepless nights, and concern for his family and that he and his family were compelled to put safety protocols in place. Webb stated further that "all four of us are in therapy because of this man." Webb also stated that Hopper showed up at his house a few months after leaving the threatening voicemail and that as a result of Hopper's actions, he and his family had switched congregations from Van Buren Kingdom Hall to Alma Kingdom Hall. Webb stated, "We cannot live like this anymore," and "My family and I are all going to go back to Florida when this is all done."

On cross-examination, Webb acknowledged that Hopper had threatened only him and not his wife and children. Webb further acknowledged that Hopper had never been physically violent toward him.

Webb's wife, Nicole Webb, also testified. Nicole stated that she is afraid of Hopper because he had threatened to kill her husband. Nicole stated that, after Hopper left the threatening voicemail on Webb's phone, they installed a security camera at their house to protect their family. When Hopper came to their house a few months after leaving the threatening voicemail, Nicole and the children were home, but Webb was not. The incident was recorded by their security camera and was played to the jury. During the incident,

Hopper came to the front door and rang the doorbell, but Nicole did not open the door. Hopper was then seen in their driveway on his phone walking around. Hopper was calling Webb, but Webb did not answer the phone. Nicole stated that she was "definitely scared" and called the sheriff. Nicole also stated, "Both of my kids have had to see a therapist because they're terrified."

Dwayne Kelch, one of the other elders at Van Buren Kingdom Hall, testified that after Pamela had consulted them about her marriage to Hopper, Hopper became aggressive toward Kelch and the other elders. Hopper came to Kelch's house uninvited in April 2022, and the security-camera recording from the episode was played to the jury. Hopper was wearing a long wig and a fake beard and had a conversation with Kelch. Kelch testified that Hopper was there to have "some questions answered." On another occasion, Hopper left Kelch a voicemail telling him to "take care of your own cows and leave my cows alone" and to "stay out of my pasture because there's a bull in this one." In the voicemail, Hopper also told Kelch to "do whatever you think is right, and if it ain't right you're going to answer for it." Hopper also sent Kelch an email stating that he had "rattled [Webb's] cage enough where [he] got some answer of what was said to Pamela."

Kelch stated that he felt threatened by Hopper's behavior. Speaking of Hopper, Kelch testified:

> He always mentioned how he was a tough guy or how he would get angry, he would express it and he would take it out on violence on others. So, I felt that when he did say there would be consequences later, I took it as a threat because of how he said that he dealt with anger in the past. . . . He said [he] just beat people up. If they crossed him, then he would get violent and that's how he took care of the situation.

6

On cross-examination, Kelch stated that he had never personally seen Hopper beat anyone up and conceded that Hopper's stories of violence "could have just been puffing."

R.J. Mann, a minister at Van Buren Kingdom Hall, testified that Hopper had "made numerous threats" against Webb "over a couple of phone conversations." According to Mann, in these conversations, Hopper said that "if [he] ever met [Webb] in a dark alley, he would regret it" and also said "something to the effect of, [Webb] is going to end up six feet under." Mann testified that because of Hopper's threats against Webb, the congregation enacted a safety protocol in which the building door is always locked and that an attendant is posted at the door to greet people and determine "whether a person appears to be disgruntled or anything along those lines." Mann also testified that Hopper had never been physically violent toward him.

On the basis of the evidence presented, the jury convicted Hopper of first-degree terroristic threatening. Hopper appealed.

## II. *Discussion*

In this appeal, Hopper raises four arguments. Hopper argues that (1) his trial counsel was ineffective, (2) there was insufficient evidence to support the verdict, (3) the trial court failed to properly instruct the jury on terroristic threatening, and (4) the record on appeal appears to be incomplete and contradictory.

### A. Sufficiency of the Evidence

7

Hopper's second argument on appeal is a challenge to the sufficiency of the evidence to support his first-degree terroristic-threatening conviction. A person commits first-degree terroristic threatening if, with the purpose of terrorizing another person, the person threatens to cause death or serious physical injury or substantial property damage to another person. Ark. Code Ann. § 5-13-301(a)(1)(A). We must address appellant's second argument first because double-jeopardy considerations require this court to review a challenge to the sufficiency of the evidence before we review the other issues on appeal. *Martin v. State*, 2018 Ark. App. 143, 545 S.W.3d 785.

In reviewing a sufficiency challenge, we assess the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Dean v. State*, 2021 Ark. App. 182. We will affirm a judgment of conviction if substantial evidence exists to support it. *Id.* Substantial evidence is evidence that is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other without resorting to speculation or conjecture. *Id.* Circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Id.* Whether the evidence excludes every other hypothesis is left to the jury to decide. *Id.* Further, the credibility of witnesses is an issue for the jury, not the court; the trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Id.*

A criminal defendant's intent or state of mind is seldom apparent. *Wells v. State*, 2012 Ark. App. 596, 424 S.W.3d 378. One's intent or purpose, being a state of mind, can

8

seldom be positively known to others, so it ordinarily cannot be shown by direct evidence but may be inferred from the facts and circumstances. *Id.* Because intent cannot be proved by direct evidence, the fact-finder is allowed to draw upon common knowledge and experience to infer it from the circumstances. *Id.* Due to the difficulty in ascertaining a defendant's intent or state of mind, a presumption exists that a person intends the natural and probable consequences of his acts. *Id.*

Hopper argues that his statements to Webb were protected by the First Amendment because he did not make a "true threat" with the subjective intent that his words would be taken as such a threat. As such, Hopper argues that the First Amendment precludes his criminal conviction. Hopper cites *Counterman v. Colorado*, 600 U.S. 66 (2023), in which the Supreme Court stated that true threats of violence lie outside the bounds of the First Amendment's protection but that the State must prove in true-threat cases that the defendant had some understanding of his statements' threatening character.

Hopper argues further that any alleged or perceived threats were only conditional and were recanted within the same voicemail. He cites *Jones v. State*, 347 Ark. 409, 64 S.W.3d 728 (2002), where the supreme court stated that whether the threat was conditional is one of the factors to be considered in determining whether there had been a "true threat" for purposes of sustaining a first-degree terroristic-threatening conviction. Hopper argues further that there was no evidence presented that he had committed any act of violence and that any inference of violence from the witnesses' testimony was speculative. Hopper submits that he did not have the purpose of terrorizing Webb and that he did not threaten to cause

9

Webb's death, and thus, that his conviction for first-degree terroristic threatening should be reversed for a lack of evidence.

We conclude that the trial court did not err in finding that Hopper's threat was not protected by the First Amendment and we hold that there was substantial evidence to prove each element of first-degree terroristic threatening. In *Lilly v. State*, 2020 Ark. App. 88, 596 S.W.3d 509, the appellant was convicted of first-degree terroristic threatening after posting death threats on the Department of Veterans Affairs' (VA's) Facebook page and challenged the sufficiency of the evidence on appeal. In *Lilly*, we stated that the conduct prohibited by the statute is the communication of the threat with the purpose of terrorizing another person, and we affirmed the conviction. We wrote:

> In his motion to dismiss, Lilly argued that his speech was protected under the Arkansas and United States Constitutions. He argued that his Facebook post was not a true threat. The court found that his statements were true threats and not mere hyperbole.
>
> Our supreme court addressed the issue of true threats in *Jones v. State*, 347 Ark. 409, 64 S.W.3d 728 (2002). There, it considered whether words contained in a rap song, in which the defendant threatened to kill a classmate and her family, constituted a "true threat." It concluded it did, after considering the five factors announced in *United States v. Dinwiddie*, 76 F.3d 913 (8th Cir. 1996). The five factors, while not exclusive, are (1) the reaction of the recipient of the threat and of other listeners; (2) whether the threat was conditional; (3) whether the victim had reason to believe that the maker of the threat had a propensity to engage in violence; (4) whether the threat was communicated directly to its victim; and (5) whether the maker of the threat had made similar statements to the victim in the past. *Dinwiddie*, 76 F.3d at 925. The goal of the court is to conduct an objective analysis focusing on how a reasonable person would have taken the statement and using the *Dinwiddie* factors. *Jones*, 347 Ark. at 421, 64 S.W.3d at 736.
>
> Here, Lilly, a former marine and VA patient, communicated directly to the VA that "it looks to me like the VA isn't going to be happy until they've caused me

to kill someone, preferably one of them" and, regarding VA employees, to "kill them all and let God sort them out." A VA employee was very concerned by the statement, deleted it from the Facebook page, and notified investigators. In the recorded interview, [a VA special agent] explained that when dealing with veterans who are trained to shoot and kill people, they have to take these kinds of threats seriously. Viewing these factors together, we conclude that it was reasonable for the VA to take Lilly's statement as a true threat. *See, e.g.*, *Jones*, 347 Ark. at 422, 64 S.W.3d at 736 ("Viewing these factors together, we conclude that a reasonable person in Arnold's position would have taken the rap song as a true threat."). Accordingly, we affirm.

*Lilly*, 2020 Ark. App. 88, at 3–4, 596 S.W.3d at 511–12.

In this case, the testimony showed that after Hopper's wife consulted with Webb about their failing marriage, Hopper suspected (wrongly) that Webb was having an affair with his wife and was advising her to divorce Hopper so Webb could acquire some of Hopper's property. Over the course of the next year, Hopper sent countless emails, texts, and voicemails to Webb expressing his suspicions and his disdain for Webb. Then on February 10, 2022, Hopper sent Webb a threatening voicemail wherein he stated in relevant part:

> You're taking advantage, in Jehovah's name, of a mentally ill person to try to get the property for yourself, for a discount.
>
> Even if you were to succeed, *you would not be able to enjoy it for very long because I'd put you six foot under the ground.*
>
> Now, go get me disfellowshipped or whatever, but it's not going to stop me. So, *if you do succeed, you will not survive.* You understand? It ain't worth it, boy. *You've messed with the wrong man and the wrong man's wife.*
>
> So go ahead and get me disfellowshipped or whatever, knock yourself out. That's what you wanted, so go for it. You're still not gonna get my property, and if you do, you're not going to enjoy it, Jack.

11

(Emphasis added.)  Although Hopper claims that he recanted his threats later in the voicemail, the last statement in his message was "I would not let you survive that."

Webb testified that after receiving the threat that Hopper would put him six feet under the ground, he was "most definitely" in a state of fear.  As a result of Hopper's voicemail, both Webb and his wife were afraid and felt compelled to install a security camera, change congregations, and make plans to move back to Florida.  After making the threats, Hopper bragged to Kelch about "rattling Webb's cage" and told Kelch how he would employ violence to take care of people who "crossed him."  Hopper also said something to Mann to the effect that Webb was "going to end up six feet under," which prompted the congregation to implement safety protocols.

Hopper directly communicated his death threats to Webb, and under the circumstances presented, both Webb and his wife reasonably perceived Hopper's statements as a true threat.  Although Hopper claims that his threat was conditional, this is only one of the five non-exhaustive factors set forth in *Jones*, *supra*.  Moreover, when he was making these threats, Hopper was clearly under the impression that Webb was already in the process of manipulating and "messing with" Hopper's wife, which was the basis for the threatening voicemail.  Having reviewed the record, we hold that substantial evidence supports the jury's finding that, with the purpose of terrorizing Webb, Hopper threatened to cause Webb's death; therefore, there was sufficient evidence to support Hopper's conviction.

B.  Ineffective Assistance of Counsel

12

We turn now to Hopper's first argument, which is that his trial counsel was ineffective in various respects. For the following reasons, we conclude that we lack jurisdiction over Hopper's ineffective-assistance-of-counsel claims.

On October 16, 2023, an amended sentencing order for Hopper's first-degree terroristic-threatening conviction was entered. On October 31, 2023, Hopper filed a pro se "Motion for Intent to Appeal, Ineffective Assistance of Counsel, Mistrial, Malicious Prosecution, Change of Venue."[1] In this motion, Hopper requested a hearing and claimed, among other things, that his trial counsel had conspired with the prosecution to cover up fraud and that "there are many more blatant disregards for the law and defense counsel was ineffective in assisting his client's cause in many areas." On November 10, 2023, Hopper's trial counsel filed a notice of appeal from the October 16, 2023 amended sentencing order, and on the same day, counsel filed a motion to withdraw as counsel. On November 14, 2023, the trial court entered an order granting Hopper's counsel's motion to withdraw.

On November 22, 2023—thirty-seven days after the amended sentencing order was entered—Hopper filed a pro se "Motion to Amend Previous Motion for New Trial." In this motion, Hopper again argued that his trial counsel was ineffective, he listed eight alleged instances of ineffective assistance of counsel, and he requested a hearing. No hearing was held on either of Hopper's pro se motions. On November 27, 2023, the trial court entered

---

[1]Arkansas Rule of Criminal Procedure 33.3(b) provides that all posttrial motions or applications for relief shall be filed within thirty days after the date of entry of judgment.

13

an "Order Denying Motion for New Trial," stating only that "the Court, having reviewed the matter, does hereby deny said motion."

On November 29, 2023, Hopper filed a pro se "Motion for Intent to Appeal." In this motion, Hopper stated:

> Appellant pro se requests an appeal bond to be set and/or his previous bond be reinstated. Appellant intends on filing a petition for evidentiary hearing within the 90 day time period, and expected request for Mistrial after having the opportunity to review the record. Appellant is continuing his Appeal pro se and needs a reasonable bond applied to perfect his appeal outside of jail.

In this motion, Hopper did not identify any judgment or order from which he was appealing. After Hopper filed this motion, he retained new counsel for purposes of filing his appeal.

Our supreme court has held that whether an appellant has filed an effective notice of appeal is always an issue before the appellate court. *Todd v. State*, 2015 Ark. App. 356, 465 S.W.3d 435. The filing of a notice of appeal is jurisdictional. *Id.* Absent an effective notice of appeal, this court lacks jurisdiction to consider the appeal and must dismiss it. *Id.*

Arkansas Rule of Appellate Procedure–Criminal 2(a) provides that the notice of appeal shall be filed within thirty days of the entry of the judgment or uniform sentencing order, or the date of entry of an order denying a posttrial motion under Ark. Rule Crim. P. 33.3. Rule 2(a) provides further that

> the person desiring to appeal the judgment or order or both shall file with the clerk of the circuit court a notice of appeal identifying the parties taking the appeal and the judgment or order or both being appealed. The notice shall also state whether the appeal is to the Court of Appeals or to the Supreme Court.

On November 10, 2023, Hopper, through his trial counsel, filed a notice of appeal from the October 16, 2023 amended sentencing order. However, there is no notice of appeal filed of record that identifies the November 27, 2023 order denying the motion for new trial. As noted, Hopper's pro se "Motion for Intent to Appeal" did not designate any judgment or order being appealed from.

In *Todd*, we stated, "Pursuant to [Arkansas Rule of Appellate Procedure–Civil] 3, a notice of appeal must designate the judgment or order appealed from, and an order not mentioned in the notice of appeal is not properly before an appellate court." 2015 Ark. App. 356, at 5, 465 S.W.3d at 438 (quoting *Johnson v. De Kros*, 2014 Ark. App. 254, at 11, 435 S.W.3d 19, 26). Because there is no notice of appeal that identifies the November 27, 2023 order denying the pro se motion for new trial based on Hopper's claims of ineffective assistance of counsel, Hopper failed to comply—substantially or otherwise—with Arkansas Rule of Appellate Procedure–Criminal 2(a). *See Mallett v. State*, 2021 Ark. App. 76. Therefore, this court lacks jurisdiction to consider either the trial court's denial of Hopper's motion for new trial or Hopper's claims of ineffective assistance of counsel that were raised in his posttrial motions.

C.  The Trial Court Failed to Properly Instruct the Jury on Terroristic Threatening

Hopper's next argument is that the trial court failed to properly instruct the jury on terroristic threatening. The trial court instructed the jury on the elements of first-degree terroristic threatening in conformance with AMI Crim. 2d 1310. Hopper did not object to this instruction, nor did he suggest or proffer any other instruction on terroristic threatening.

15

Hopper now argues that the trial court erred in failing to provide the jury with additional instructions based on the "true threat" analysis in *Counterman*, 600 U.S. 66, and the five-factor test in *Jones*, 347 Ark. 409, 64 S.W.3d 728.

Hopper's argument regarding the jury instructions is not preserved for review because he did not proffer any of his proposed instructions to the trial court. In *McCullon v. State*, 2023 Ark. 190, 679 S.W.3d 358, the supreme court held that to preserve an objection to an instruction for appeal, the appellant must make a proffer of the proposed instruction to the court. That proffered instruction must then be included in the record to enable the appellate court to consider it. *Id.* An instruction that is not contained in the record is not preserved and will not be addressed on appeal. *Id.* Here, because Hopper failed to proffer any proposed additional jury instructions on terroristic threatening, this issue is not preserved for our review, and we need not address it.

D. The Record on Appeal Appears to be Incomplete and Contradictory

For his final point on appeal, Hopper (through counsel) claims that the record on appeal appears to be incomplete and contradictory. Hopper's counsel notes that, after the record was filed but before the case was submitted, Hopper filed a pro se motion for writ of certiorari to complete the record alleging that numerous hearings and documents had been omitted and that this court denied that motion. Under this point on appeal, Hopper's counsel concedes that he is "not cognizant of the importance or lack thereof of these hearings on any appeal matters." He also states, "I am submitting this appellate brief in good faith

assuming relevant records and evidence [already] submitted suffice for the points on appeal that I have submitted."

We have made it exceedingly clear that we will not consider an argument when the appellant presents no citation to authority or convincing argument in its support, and it is not apparent without further research that the argument is well taken. *Rawlins v. State*, 2024 Ark. App. 83, 684 S.W.3d 602. Under this point, Hopper concedes he is not aware of any material omissions in the record, and he presents no convincing argument for relief. Therefore, this point raises no grounds for relief.

III. *Conclusion*

In conclusion, we hold that there was sufficient evidence to support Hopper's conviction for first-degree terroristic threatening and that he has presented no meritorious argument with respect to his conviction. Therefore, his conviction is affirmed. Further, because Hopper failed to file an effective notice of appeal from the order denying his posttrial motion for new trial based on his claims of ineffective assistance of counsel, we dismiss the portion of the appeal pertaining to his ineffective-assistance claims.

Affirmed in part; dismissed in part.

VIRDEN and BROWN, JJ., agree.

*Roland V. Funk*, pro hac vice, for appellant.

*Tim Griffin*, Att'y Gen., by: *Lauren Elizabeth Heil*, Ass't Att'y Gen., for appellee.